**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

CHRISTIN P. PEARSON, et al.,

Plaintiffs,

v.

COMMUNITY UNIT SCHOOL DISTRICT 303, et al.,

Defendants.

Case No.: 1:20-cv-05096

Honorable John Robert Blakey

---

COMMUNITY UNIT SCHOOL DISTRICT 303, et al.,

Third-Party Plaintiffs,

v.

UNITED SEATING AND MOBILITY, LLC a Missouri Limited Liability Company, d/b/a NUMOTION,

Third-Party Defendant.

---

UNITED SEATING AND MOBILITY, LLC a Missouri Limited Liability Company, d/b/a NUMOTION,

Defendant / Third-Party Defendant / Cross-Plaintiff,

COMMUNITY UNIT SCHOOL DISTRICT 303, et al.,

Defendant / Third-Party Plaintiffs / Cross-Defendant.

---

**NUMOTION'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR**
**<u>SUMMARY JUDGMENT PURSUANT TO RULE 56(a)</u>**

NOW COMES, Defendant/Third-Party Defendant/Cross-Plaintiff, UNITED SEATING AND MOBILITY, LLC, a Missouri Limited Liability Company, d/b/a NUMOTION ("NUMOTION"), by and through its counsel, NIELSEN, ZEHE & ANTAS, P.C., and for its Memorandum of Law in support of Numotion's Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56(a), sets forth the following:

## I. INTRODUCTION:

The original state court filing of this lawsuit in 2020 did not include Numotion as a party. *See* Ex. 1[1], Complaint at Law, Doc. #5. Indeed, through and including the Third Amended Complaint, Plaintiffs have consistently alleged that Corban Pearson ("Corban") was injured as the result of his 380 pound electric wheelchair tipping forward during his transportation on a specially equipped school bus. *Id*. Plaintiffs allege that his accident was due to the combination of improper securement of the wheelchair, coupled with heavy braking of the bus. Compare Ex. 1, Doc. #5, pgs. 4-5, ¶24-27, with Ex. 2, Third Amended Complaint, Doc. #182, pgs. 5-6, ¶27-30. Plaintiffs attribute the failure to secure Corban's wheelchair to the conduct of Defendants, Community Unit School District 303 (”CUSD"), bus driver, Antoinette Green ("Green") and bus aide, Pam Karnick ("Karnick") (collectively, "District Defendants"). *See* Ex. 2, Doc. #182, pgs. 1-23, ¶¶27-30.

Numotion was added as a party to this lawsuit by way of claimed "negligent design" and "negligence" theories. Doc. #182, pgs. 18-23. However, Plaintiffs acknowledge that Corban's wheelchair was manufactured by Permobil and not Numotion. *See* Ex. 2, Doc. #182, p.18, ¶43; Declaration of Attorney Paul Bozych; Exs. 3-1 and 3-2. Given that Numotion played no role in the design, development, or manufacture of Corban's wheelchair, it is not surprising that Plaintiffs failed to disclose an expert who can define the design standard of care and was not critical of the

[1] The Exhibit List is attached hereto as Appendix A.

wheelchair design, which complied with all industry standards. Plaintiffs likewise failed to disclose an expert who can testify that Numotion acted negligently.

Plaintiff's sole Rule 26 expert from an engineering standpoint is Timothy Hicks ("Hicks"), a mechanical engineer, who also holds himself out as an expert in accident reconstruction. SOF #37.[2] In a negligent design case, Plaintiffs have the burden of demonstrating the standard of care concerning the design and a deviation from the standard of care. Plaintiffs have failed to meet their burden as to design elements and thus waive their claim. *Salerno v. Innovative Surveillance*, 402 Ill. App. 3d 490, 932 N.E. 2d 101, 111 (1st Dist. 2010). Moreover, both Hicks' testimony and his expert report issued in advance of his deposition unequivocally declare that Numotion's involvement was not causally related to the alleged occurrence and injuries. SOF #31, #37, #39. Following closure of expert discovery, Plaintiffs have fallen woefully short of producing the requisite evidence to support the essential elements of their claims as to Numotion.[3] Importantly, Plaintiffs were obviously aware of Hicks' report and deposition testimony prior to filing the Third Amended Complaint which carried forward the two counts pleaded against Numotion.

## II. PROCEDURAL HISTORY AND RECORD OF EVIDENCE:

### A. The Record Concerning The Events on the School Bus on 8/14/19:

The Third Amended Complaint alleges that on August 14, 2019, Corban was injured as the result of his wheelchair tipping forward resulting in Corban falling forward, as well. Ex. 2, Doc. #182, ¶15, ¶30. The wheelchair alone weighed approximately 380 pounds. SOF #41. On August 14, 2019, Corban weighed approximately 176 pounds and was almost five feet tall. SOF #3. The cumulative weight was thus approximately 556 pounds.

[2] Numotion's Rule 56.1(a)(2) Statement of Material Facts is abbreviated and referenced herein as "SOF".
[3] The Parties have advised the Court that all discovery, including expert discovery, has been completed. *See* Doc. #160, p. 2, which is Ex. 16 hereto.

At the time of the alleged occurrence, Corban was being transported home on a school bus at approximately 3:45pm following the first day of the school year. SOF #6, #27. Green served as the bus driver and Karnick, the bus aide,. SOF #4 and SOF #5.

During transport on the school bus, the wheelchair was being used as a seat on the bus for Corban. In other words, Corban was being transported in his wheelchair rather than Corban being seated in a traditional bus bench seat. SOF #18, #19, #20, #48. Plaintiffs allege that Green and Karnick never properly secured the wheelchair in place and also failed to fasten a three-point restraint system around Corban. *See* Ex. 2, Doc. #182, p. 5, ¶27-28. Plaintiffs further allege that as a result of a heavy braking event by the bus driver, Corban's wheelchair tipped forward resulting in injuries. *Id*. at ¶30, ¶42. Karnick, the eyewitness to these events, testified that the driver, Green was driving 45 mph and abruptly applied the bus brakes to avoid missing a turn. SOF #14, #23.

During the bus transit, there were only four students on the bus, as the bus left school. *See* Ex. 2, Doc. #182, pg. 5, ¶26; SOF #8. Corban and another student in a wheelchair were positioned single file facing the front of the bus on the driver's side. SOF #48, #49. The other student in a wheelchair left the bus before the alleged occurrence. SOF #49. Thus, prior to the occurrence there were no more than three students on board and only Corban occupied a wheelchair. Karnick was seated across the bus aisle from Corban in a bench seat. SOF #25.

See Figure 1 below from the report of the expert for the District Defendants, Mr. Toomey, which depicts one of four Q-Straint securement straps affixed to the bus floor which collectively form part of the system to secure the wheelchair. SOF #50, #79; *see also* Ex. 4, p. 60. The Q-Straint securement on the bus was certified to both ANSI WC-19 and ISO 7176. SOF #50. Figure 2 below, from Plaintiff's expert (Hicks') report depicts the space on the driver's side of the bus for the wheelchairs and securement system for the two wheelchairs. SOF #34; *see also* Ex. 4, at pg. 5,



Figure 1 – Q'Straint Deluxe and L-Track




Figure 2 – Subject bus BraunAbility wheelchair lift (left), and Q'Straint wheelchair securement system for rear position (right)

Karnick, the bus aide, testified that Corban had a large wheelchair. SOF# 18. She had never worked with a wheelchair as large as Corban's wheelchair. *Id*. Karnick had difficulty getting her hands behind Corban's wheelchair. SOF #19. There was little space between the rear of the wheelchair and the back wall of the school bus. *Id*. The lack of space created an issue for Karnick and Green to get the wheelchair secured. SOF #19. The bus driver, Green, walked to the back of the bus at 3:45pm and still remained there at 3:49 pm. SOF #7. At that time, Green and Karnick were still attempting to secure Corban's wheelchair. SOF #12. Green was summoned to the back of the bus by Karnick so that Green could evaluate how the securement straps were being used by Karnick. SOF# 28. At the time, Karnick admonished Green to be careful driving around corners.

SOF# 29. Green assured Karnick that she would be careful driving around corners. SOF #12.

The three-point harness is an additional Q-Straint device to keep the wheelchair and occupant properly restrained. SOF #30; *see also* Figure 2. According to the School District's Rule 26 retained expert, Mr. Toomey, proper use of the three-point restraint system around Corban was required by all applicable standards. SOF #53.

Karnick testified that Corban's three-point harness was not being used at the time of the accident. SOF #25. Green likewise admitted that the three-point shoulder harness was not fastened around Corban. SOF #26. Without the three-point harness being fastened, the bus should not have been moving, per Ms. Karnick and it was her job to stand up and correct this. SOF #25.

According to the testimony of Mr. Hicks, the forward momentum created by the bus speed and braking were forceful enough to tip the 380 pound wheelchair with Corban (176 lbs.) forward. SOF #33, #38. Mr. Hicks further testified that if the three-point harness had been utilized, the harness would have prevented the tipping following the heavy braking event. SOF #31.

Green admitted that as the driver of the bus, she could have checked to make sure that the securement straps were properly secured and actually fastened to lock Corban's wheelchair in place. SOF #9, #13. On or about April 11, 2023, Green was found guilty by a Kane County jury of the crime of endangering the life of a child as a result of the events surrounding Corban's transportation on the way home from school on August 14, 2019. SOF #10.

Karnick believes that when the wheelchair securement straps are properly placed, the wheelchair is incapable of moving. SOF #20. Plaintiff's expert, Mr. Hicks, similarly testified that had Corban's wheelchair been properly secured using the bus securement straps, the wheelchair could not have tipped over the manner it did in this occurrence. SOF #40. The School District expert, Daniel Toomey, P.E., agreed that the wheelchair could have been safely secured

with the Q-Straint system on the bus. SOF #50, #52.

Prior to Corban's occurrence, the second student in the wheelchair was dropped off at that student's destination. SOF #49. Once the second wheelchair was removed from the bus, no effort was made in any manner to reposition Corban or re-evaluate any securement devices prior to the time Corban's wheelchair tipped forward. Accordingly, Corban was the only wheelchair occupying the space on the bus designated for two wheelchair spaces. *See* Figure 2 *infra*, p. 4.

**B. The Allegations Concerning Numotion:**

Plaintiff's Third Amended Complaint contains two similar counts against Numotion. The two counts are labeled Count VI-Negligence and Count VII-Negligent Design. *See* Ex. 2, Doc. #182, pp. 18-20. The gravamen of both counts is the allegation that the wheelchair delivered to Corban in 2016 did not have attached support wheels, sometimes also referred to as anti-tippers. *Id*. (compare allegations in Count VI, ¶47(b), "Failed to ensure the Subject Wheelchair included anti-tippers upon delivery", with allegations in Count VII, ¶47(b), "Failed to design the Subject Wheelchair with anti-tippers upon delivery".)

The Illustration of "Technical Specifications" below from Permobil F3 Corpus December 2015 User Manual depicts a wheelchair with attached support wheels. SOF #71; *see also* Group Ex. 13 (as provided to the Pearsons). However, the Technical Specifications below describe the wheelchair dimensions both with and <u>without</u> inclusion of support wheels. This is consistent with the content of the User's Manual which makes support wheels optional for someone like Corban (i.e., under 200 pounds, with a reduced speed package). SOF #45, #69, #77; *see also* Ex. 14.

The User's Manual provides: "Dear Permobil Owner… Before you begin using your wheelchair, it is important that you read and understand the content of these operating instructions and in particular the Safety Instructions. SOF #66, #67; *see also* Group Ex. 15. The Pearsons

ordered the wheelchair through Rush University and went to Rush several times to be fitted, followed by a representative coming to their house to show them how to use the subject wheelchair and to make sure all was good with it. SOF #54. Mrs. Pearson agreed that she received the user's manual. SOF #54. Mrs. Pearson signed and initiated a form which allowed her to decline the option of support wheels. SOF #72.

User's Manual Permobil F3 Corpus Technical Specifications

TECHNICAL SPECIFICATIONS



Base length 40" w/ support wheels 36" w/out
Base height 38"-46"

Base width 24"

Smallest transportation size
Base length 31" (35" w/ support wheels
Base width 24" (up to 31" incl. armrest)
Base height 32.5"

211
Numotion 001282

The Permobil User's Manual for the subject Corpus F3 at page 26 provided that support wheels are "optional" if the user weighs less than 200 lbs. and the speed package is reduced to 5 mph or less. SOF #45, #69, #77; *see also* Ex. 14. The F3 Corpus User Manual likewise provides that the wheelchair may be fitted with front support wheels to provide extra stability when operating the wheelchair over obstacles, at certain speeds and on inclines. SOF #55; *see also* Group Ex. 13, which explains the use of support wheels for some possible operating conditions.

The Permobil Technical Specification, as well as Group Ex. 13 and 14 demonstrate that the Permobil F3 Corpus could be used by Corban both with and without support wheels. The manufacturer expressly provided that when the user weighs less than 200 pounds and the speed package is reduced, support wheels are optional. SOF #45, #69, #77; *see also* Group Ex. 14. The function that support wheels may provide for operational needs include driving in certain conditions and high speeds (e.g., inclines and declines, curbs, rough terrain, and uneven surfaces.) However, as explained in greater detail below, support wheels are <u>not</u> part of wheelchair securement on a bus. The User's Manual describes the importance of using only a crash tested wheelchair in an approved securement system for transport. See Ex. 18; SOF #71. The User's Manual does not include support wheels in the "Transport Warnings." *Id.*

Importantly, support wheels are connected on the wheelchair well above the ground or floor surface. See Group Ex. 13. As such, Plaintiff's expert engineer, Mr. Hicks, explained that the momentum of the braking event would have necessarily tipped the wheelchair forward enough until support wheels, if present, would actually engage the floor of the bus. SOF #39. According to the testimony of Mr. Hicks, **"By the time [support wheels] come into contact with the floor of the bus, there's enough momentum where it may have slowed things down briefly to let the aide grab Corban or the wheelchair, but it's more likely than not that all things staying the same where the wheelchair tipped over anyway, I don't think the anti-tip wheels would have made a difference. So that's kind of the process that I used to come up with opinions I had."** SOF #39 (emphasis added).

Mr. Hicks further explained that **"The fundamental issue is physics. So when the braking occurred, it was enough momentum of Corban and his wheelchair upwards of going on 500 pounds combined. That's a lot of momentum at whatever speed they were going.**

**You've got a significant braking event to cause that force, or that mass to continue to try to go forward it not properly restrained."** SOF #38 (emphasis added). Thus, it was the testimony of Mr. Hicks that, **"[D]ue to the speed of the braking incident, and the fact that neither Corban nor his wheelchair were properly restrained, it is unlikely that the anti-tip support wheels would have made a difference in keeping the wheelchair and Corban from tipping and rotating forward onto the bus floor."** SOF #37 (emphasis added).

Mr. Hicks included the same language in his Rule 26 expert report, which contains his professional engineer stamp and that of his partner reviewer in advance of his deposition. SOF #80. Mr. Hicks Rule 26 report similarly sets forth in the Opinions and Conclusions section that, **"[D]ue to the speed of the subject bus at the time of the heavy braking incident, and the fact that neither Corban nor his wheelchair were properly restrained it is unlikely that the anti-tip support wheels would have made a difference in keeping the wheelchair and Corban from topping and rotating forward onto the bus floor."** *See* Ex. 4, pg. 12. (emphasis added).

The illustrations in the User's Manual support the opinion given by Mr. Hicks. See Group Ex. 13. Support wheels are attached to the wheelchair in settings above the floor/ground. *Id*. Thus, the support wheels do not engage at all until the wheelchair has already tipped. In this case, Plaintiff's expert argued that "physics" was the "fundamental issue" at play. SOF #8. The heavy braking, the weight, the lack of securement caused the tip. SOF #37, #38, #39.

The record further demonstrates why support wheels are completely unrelated to Corban's occurrence. Numotion's Rule 26 expert is Miriam Manary. She is a lead research engineer at the University of Michigan Traffic Research Institute ("UMTRI"). SOF #57. One aspect of the work includes crash testing wheelchair tie-down systems which are used to secure a wheelchair and provide occupant protection for the persons seated in the wheelchair. SOF #63.

As noted above, support wheels can aid in providing extra stability in specific wheelchair "operation" scenarios, such as high speeds, driving down a steep slope or traversing uneven ground. SOF #55.[4] However, the design standards relating to safety of wheelchairs permitted to be used as a car seat do not even reference support wheels. SOF #56. Pursuant to Section 19 of the industry standards of Rehabilitation Society of North America ("RESNA"), to qualify as a wheelchair safe for use during transport in a motor vehicle, the manufacturer does not need to include support wheels. SOF #56, #58. Support wheels are not required because support wheels are not critical to performance (SOF #59) and there is no benefit added to a properly restrained wheelchair. SOF #61. Moreover, RESNA has experienced support wheels coming off during crashed and heavy breaking events and creating a risk of being a projectile on the bus. SOF #62.

The retained Rule 26 witnesses for all parties in this lawsuit concur that by using the Q'Straint securement system existing on the school bus on August 14, 2019, Corban's wheelchair could have been properly strapped in the designated space making tipping over impossible. *See* SOF #50, #52 (for District Defendants); SOF #40 (for Corban); and SOF #60 (for Numotion). According to the District Defendants' Rule 26 retained witness, if even one of the two rear securement straps had been properly connected to Corban's wheelchair, the wheelchair would not have been able to overturn. SOF #52.

As explained in detail above, support wheels can play a role in providing stability in potential wheelchair operational scenarios. *See, e.g.*, Group. Ex. 13. Support wheels, however, do not play a role in wheelchair securement when the wheelchair is used as a seat on a vehicle. SOF #55, #62. For this reason, the industry does not require support wheels for securement in bus transit. SOF #55, #61. Corban's wheelchair was certified by design standards from ANSI and ISO.

---

[4] Corban's wheelchair was at all relevant times speed restricted such that support wheels were optional. SOF #17; Ex. 14.

SOF #55, #61. See also, Ex 15, Ex. 17. Support wheels were optional for Corban's wheelchair and Mrs. Pearson signed and initialed a form declining support wheels. SOF #72. At the time, Corban was still independently participating in some transfers out of his wheelchair via a "stand and pivot," to which support wheels could interfere. SOF #54, #75, #76, #78.

With regard to support wheels, Plaintiff's expert did not conclude that Numotion was negligent. Rather, in his expert report's "Opinions and Conclusions," Mr. Hicks merely wrote, "It is not clear if Numotion provided enough information about the need or purpose for the anti-tip support wheels at the time of purchase by the Pearson." See Ex. 4, pg. 12. See also SOF #80. Mr. Hicks' conclusion fails to support a negligence claim.

## III. <u>LEGAL AUTHORITY APPLIED TO EVIDENTIARY RECORD</u>:

A ruling on a motion for summary judgment necessarily implicates the substantive law that would govern the case at the trial on the merits. *Klootwyk v. Daimler Chrysler Corp.*, 2003 U.S. Dist. Lexis 7768, *4. The claims made against Numotion are state law claims. Ex. 2, Doc #182, pg. 4 ¶14. The *Erie* doctrine mandates that state law applies to the counts. *Houben v. Telular Corp*., 309 F. 3d 1028, 1032 (7th Cir. 2002); *see also Cook v. Hoppin* 783 F. 2d 684, 691 (7th Cir. 1986) (holding that the law of state of alleged injury controls.) Illinois law thus applies.

Claims of negligent design fall within the framework of common law negligence. *Salerno v. Innovative Surveillance Tech. Co.*, 402 Ill App. 3d 490, 932 N.E.2d 101, 110 (1st. Dist. 2010). "Thus, a plaintiff must establish the existence of a duty of care owed by the defendant, a breach of that duty, an injury proximately caused by that breach, and damages." *Id.* (quoting *Calles v. Scripto-Tkai Corp.*, 224 Ill 2d 247, 270 (2007)). If the plaintiff fails to present sufficient evidence to establish any element of his cause of action, summary judgment is proper. *Id.* at 107.

It is well settled in Illinois that "the key question in a negligence design case is whether the

manufacturer exercised reasonable care in designing the product." *Jablonski v. Ford Motor Co.* Numotion did not manufacture or design any aspect of the subject wheelchair. Moreover, Plaintiff did not disclose the design standard of care, criticisms of the design or a causal connection to the design.

In Illinois, plaintiff must demonstrate a causal relationship between the injury and the manufacturer's product. *Thornton v. M7 Aerospace LP,* 796 F 3d 757, 769 ( 7th Cir. 2015). In order "to get to the jury", the plaintiff must demonstrate more than a mere possibility that the product caused the injury. *Id.* Rather, the plaintiff must come forward with evidence justifying an inference of probability. *Id.*

In *Thornton*, a defendant (Jepperson) produced and sold charts for airplane pilots to use while performing non-visual approaches. *Id*. at 762. The Seventh Circuit affirmed summary judgement reasoning that, "there is no evidence from which a reasonable jury could infer that Jeppesen's charts probably contributed to the crash. The plaintiffs would like for us to allow this case to reach a jury based on the argument that because they can establish that the charts were flawed, we can infer that the charts probably contributed to the crash. But this speculation is impermissible. *Id.* at 770. The *Thornton* court pointed out the absence of evidence "that any flaws in the charts actually caused the pilots to lose situational awareness or otherwise descend below the minimum safe altitudes." *Id*.

*Klootwyk,* cited above, was a product liability action which has similarities to the matter at bar. Plaintiff suffered fatal cardiac arrest while driving a car. The decedent's air bag failed to deploy in the ensuing collision. Only the defendant offered causation testimony. The defense expert testified that Mr. Klootwyk died from the cardiac arrest and not the collision. 2003 U.S. LEXIS 7768 *8. Summary judgment was granted on the basis that plaintiff failed to provide proof

of causation through expert testimony. While this "rendered all other facts immaterial", the court noted that summary judgement could have likewise been granted due to the failure to produce evidence on the other essential elements of the claim. *Id.*

The matter *sub judice* provides an even more compelling case for summary judgment than *Klootwyk* or *Thornton.* Here, Plaintiff's sole engineering and reconstruction expert argued forcefully in his Rule 26 report and through his deposition that Numotion's alleged involvement was not causally related to the event and injuries giving rise to the lawsuit. Plaintiff is thus unable to "get to the jury" as to Numotion due to the fact that Plaintiff's declared expert has refuted causation through his own words.

Beyond the lack of causation, Plaintiff's expert likewise falls far short of demonstrating that Numotion acted negligently. In the Opinions and Conclusions section of his Rule 26 report, Mr. Hicks merely raises a rhetorical question relative to Numotion's conduct. To wit, "It is not clear if Numotion provided enough information about the need or purpose for the anti-tip support wheels at the time of purchase by the Pearsons." Ex. 4, p.12. Like the causation opinions, Mr. Hicks' other opinions similarly preclude Plaintiffs from getting to the jury.

Plaintiff has the burden in a design case of demonstrating both standard of care concerning the design and a deviation. *Salerno*, 932 N.E. 2d at 111. Plaintiffs have done neither. Like *Salerno*, they have "nothing to criticize" and thus waive their claim. *Id.*

Mr. Hicks has no quarrel with the wheelchair design or the design of the Q-Straint system. Mr. Hicks readily admits that had the Q'Straint system on the bus been properly used on the wheelchair no tip event would have occurred with Corban. SOF # 40. Unlike Numotion's expert Ms. Manary, Mr. Hicks does not have the background to be competent in the standards applicable to crash testing and securing wheelchairs being used as seats in automobiles. If he had this

background, Mr. Hicks would know that federal standards do not require or even mention support wheels for use in transit. SOF #55-#61. Given that Hicks has nothing to criticize in the design of the wheelchair made by Permobil, not Numotion, Plaintiff cannot proceed on the negligent design or negligence claims. *Salerno*, 932 N.E.2d at 110-111.

In sum, Plaintiffs have knowingly carried forward claims refuted by their own expert of ordinary negligence and negligent design without the requisite expert support and without appreciating that a negligent design claim may only rightfully lay against a manufacturer. *See Salerno*, 402 Ill. App. 3d at 501 ("Because products liability actions involve specialized knowledge or expertise outside of a layman's knowledge, *the plaintiff must provide expert testimony on the standard of care and a deviation from that standard to establish either of these propositions*." *Id*. (emphasis added); *see also Jablonski v. Ford Motor Co.*, 955 N.E.2d 1138, 1154 (2011) (emphasis added) ("[T]he key question in a negligent-design case is whether the *manufacturer* exercised reasonable care in designing the product."). In doing so, Plaintiffs have also failed to establish that Numotion engaged in willful and wanton conduct as Numotion complied with the Permobil User Manual, and industry standards as set forth by both ISO and RESNA which do not require the addition of support wheels.

Finally, Green was convicted of Endangering the Life or Health of A Child. SOF #10. While Green and CUSD, may have stood in a "special relationship" with Corban, there was not such a relationship with Numotion. Numotion had no ability to control Green's conduct, who was acting within the scope of her agency with CUSD. SOF #16. Therefore, Numotion did not owe a duty to protect against the criminal acts of Green which proximately caused Corban's injuries. *See Hills v. Bridgeview Little League Ass'n*, 195 Ill. 2d 210, 228-29 (2000); *see also Bogenberger v. Pi Kappa Alpha Corp., 2018 IL 120951, P33.*

## IV. CONCLUSION:

The original filing of this lawsuit did not include Numotion as a party. Rather, the lawsuit was originally pleaded against the School District Defendants, who were alleged to have been responsible for securing Corban's wheelchair in the bus. At the time of the occurrence alleged, Corban was using a crash tested and RESNA/ISO certified wheelchair and the bus was equipped with a certified securement system.

Plaintiff's subsequent efforts to establish a design case against Numotion fail by a wide margin and waive the two claims alleged. Plaintiffs ignore that Numotion did not design or manufacture the wheelchair. Further, Plaintiff's sole engineering expert has failed to disclose the design standard of care and failed to disclose deviations from an established design standard. The expert similarly failed through his Rule 26 report to support the negligence claim. Perhaps most importantly, Plaintiff's expert repeatedly refuted causation. That is to say that the expert asserted in both his Rule 26 report and his testimony that the wheelchair did not play a role in the events giving rise to this lawsuit. The expert had his report peer reviewed by his partner, and both stamped the report with their Illinois licensed professional engineering stamp. Ex. 4; *see also* SOF #80. Knowing the content of both the Rule 26 report and the expert's deposition testimony, Plaintiff nonetheless filed the Third Amended Complaint against Numotion.

Summary judgement is appropriate for all of the reasons set forth above.

Dated: January 27, 2025

Respectfully submitted,

*/s/ Paul Bozych*
One of NUMOTION's Attorneys

Dominick W. Savaiano (ARDC No. 6181611)
Paul Bozych (ARDC No. 6199780)
Kyle H. Fleck (ARDC No. 6332222)

Nielsen, Zehe & Antas, P.C.
55. W. Monroe Street, Ste. 1800
Chicago, Illinois 60603
(312) 322-9900
dsavaiano@nzalaw.com
pbozych@nzalaw.com
kfleck@nzalaw.com