**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTIN P. PEARSON, individually and as Guardian of the Estate of CORBAN PEARSON; and LISA A. PEARSON, individually and as co-Guardian of the Estate of CORBAN PEARSON, | ) | Case No.: 1:20-CV-05096 |
| Plaintiffs, | ) | Honorable John Robert Blakey |
| v. | ) | |
| COMMUNITY UNIT SCHOOL DISTRICT 303, ANTOINETTE L. GREEN, PAM KARNICK, TERRY PRIMDAHL and United Seating and Mobility, L.L.C., a Missouri limited liability company, d/b/a NUMOTION | ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO COMMUNITY UNIT SCHOOL DISTRICT 303 DEFENDANTS' STATEMENT OF FACTS**

Plaintiffs, Christin P. Pearson and Lisa Pearson, individually and as the Guardians of Corban Pearson, by and through their attorneys, O'Hagan Meyer, LLC, move this Court, pursuant to Federal Rule of Civil Procedure 56 and Rule 56.1(b), submit their Response to Community Unit School District 303 Defendants' Statement of Facts in Support of Their Motion for Summary Judgment, as follows:

**RESPONSE TO THE STATEMENT OF FACTS**

**Jurisdiction, Venue, and Parties**

1. Jurisdiction and venue are not disputed as this action is properly before this Court. ***See* Ex. A (Third Amended Complaint, Dkt. 182 ("TAC")) at ¶¶ 12-14.**

**RESPONSE:** Not in dispute.

2. Plaintiff, Corban Pearson, was born on February 2, 2006, and, at all times relevant

to this Complaint, was a resident of St. Charles in Kane County, Illinois. **Ex. A (TAC) at ¶ 1.**

**<u>RESPONSE:</u>** Not in dispute.

3. Plaintiffs Lisa Pearson and Christin Pearson are residents of St. Charles in Kane County, Illinois. ***Id.* at ¶¶ 4, 5.** Lisa Pearson is the adoptive mother of Corban, and his primary caregiver. ***Id.* at ¶ 5; Ex. B (L. Pearson Dep.) 17:4-8, 175:18-20.** Christin Pearson is the adoptive father of Corban. **Ex. A (TAC) at ¶ 4.** After Corban reached the age of majority, on February 2, 2024, Lisa Pearson and Christin Pearson were appointed Corban's Co-Guardians by the Circuit Court of Kane County, Illinois. ***Id.* at ¶¶ 4, 5.**

**<u>RESPONSE:</u>** Not in dispute.

4. Defendant Community Unit School District 303 ("District 303") is a public entity located in Kane County, Illinois. ***Id.* at ¶ 6.** Wredling Middle School is within District 303. ***Id.* At** ¶ 2.

**<u>RESPONSE:</u>** Not in dispute.

5. Defendant Terry Primdahl served as the Director of Transportation at District 303 during the relevant time period. **Ex. C (Primdahl Dep.) 16:20-22, 18:16-18.** At the time of her retirement in June 2023, she had served as the Director of Transportation for ten years and had been employed by District 303 for a total of 28 years. ***Id.* at 16:3-15, 18:10-18**.

**<u>RESPONSE:</u>** Not in dispute.

6. As of August 14, 2019, Defendant Antoinette Green had been employed with District 303 as a bus driver for almost nine years. **Ex. D (Green Dep.) 13:7-22.**

**<u>RESPONSE:</u>** Not in dispute.

7. As of August 14, 2019, Defendant Pam Karnick had been employed with District 303 as a bus monitor for four years. **Ex. E (Karnick Dep.) 13: 8-14.**

**RESPONSE:** Not in dispute.

**Defendants' Roles, Duties and Training**

8. As Director of Transportation, Primdahl oversaw all aspects of transportation operations, which includes direct supervision of all transportation personnel, including bus drivers and monitors. **Ex. C (Primdahl Dep.) 18:23-19:6, 20:12-15, 21:12-16.** She does not conduct any training herself, as that is handled by other employees of District 303. ***Id.* at 20:16-23, 22:3-8.**

**RESPONSE:** Not in dispute.

9. District 303's bus drivers, including Green, complete mandated State of Illinois training to receive their school bus endorsement, and they also must receive an annual two-hour training certification, as mandated by the State of Illinois. **Ex. C (Primdahl Dep.) 27:15-22, 60:18-62:19; Ex. D (Green Dep.) 13:7-22, 17:3-15, 22:7-18.**

**RESPONSE:** Not in dispute.

10. District 303 provides bus drivers with training relating to special education students, which follows the State's curriculum. **Ex. C (Primdahl Dep.) 65:2-17.** The driver and bus monitor serve as double checks of each other, which ensures an additional safety check. ***Id.* at 67:8-17.**

**RESPONSE:** The amount and type of training is in dispute based on the testimony of Green. (*See* Doc. 230 at ¶ 1).

11. As bus monitor or monitors, Karnick was responsible for making sure that special needs students were in their seats. **Ex. E (Karnick Dep.) 13:18-23, 94:17-95:23.**

**RESPONSE:** Not in dispute.

12. Karnick was trained by District 303 to successfully perform her duties, including properly securing wheelchairs to the bus floor. **Ex. E (Karnick Dep.) 14:10-15:14, 91:19-93:6,**

**100:19-101:11.**

**RESPONSE:** Disputed as to all material assertions. (*See* Doc. 195 at ¶ 31).

13. A document prepared by one of District 303's trainers, Tracy Alsup, dated April 12, 2018, states:

> Pam Karnick went out on training on her route 255 on April 12th 2018. Pam [p]roperly fasten[ed] all students in the 5 points and adjusted straps as needed. Pam also secured wheelchair and all tie downs properly as well as securing the wheelchair brake both inside the bus and on the Lift. [Tracey Alsup] asked Pam if she needed any further training and she was good and understood all procedures for 5 points and the wheelchair. There were no issues [Tracey Alsup] noted and no further training was needed.

**Ex. F (Safety Step Training); Ex. C (Primdahl Dep.) 34:10-15**. This document certified that Karnick completed the safety steps. **Ex. C (Primdahl Dep.) 34:2-15.**

**RESPONSE**: Not in dispute with regard to the content of the document.

14. District 303 aligns its transportation policies with the guidelines published by the State of Illinois. **Ex. C (Primdahl Dep.) 43:23-44:10, 45:1-4, 50:23-51:2.**

**RESPONSE**: Disputed as to all material assertions. (*See* Doc. 230 at ¶ 17).

15. In addition to her training, District 303 provided Karnick with policies and procedures on how to secure wheelchairs to a school bus. **Ex. E (Karnick Dep.) 21:16-22:9, 82:2-20, 96:23-97:8; Ex. C (Primdahl Dep.) 80:17-81:10.**

**RESPONSE**: Not in dispute as to the providing of the policies.

16. District 303 has used an 83-page training aide, which is maintained in the normal course of business, to train bus drivers and bus monitors since August 2008. **Ex. G (Training Aide); Ex. C (Primdahl Dep.) 51:4-52:10.** The Training Aide was in Green and Karnick's yearly folder with their bus route every year. **Ex. C (Primdahl Dep.) 54:20-55:17.**

**RESPONSE:** Not in dispute.

17. The Training Aide includes an article titled "Wheelchair Transport Safety," which states certain "dos" and "don'ts." **Ex. G (Training Aide) at D303 564-565; Ex. C (Primdahl Dep.) 53:1-19.**

**RESPONSE**: Not in dispute.

18. In addition to the route, the bus drivers' and bus monitors' yearly folders also contained emergency numbers for the office. **Ex. C (Primdahl Dep.) 55:18-56:22.**

**RESPONSE**: Not in dispute.

19. A parent of one of the students also trained Karnick on how to secure a motorized wheelchair to the bus in the first year of her employment with District 303. **Ex. E (Karnick Dep.) 16:16-17:5.**

**RESPONSE**: Not in dispute.

20. Karnick employed the same process she learned in her training when she secured Corban's wheelchair to the bus on the afternoon of August 14, 2019. **Ex. E (Karnick Dep.) 19:10-20, 20:7-9.**

**RESPONSE**: Plaintiffs dispute that Corban was properly secured to the bus on the afternoon of August 14, 2019. (*See* Doc. 195 at ¶ 31).

**Corban Pearson's Physical Condition and Wheelchair**

21. Corban is paraplegic due to muscular dystrophy, has high-functioning autism, and, at the time of the incident on August 14, 2019, (unbeknownst to Karnick and Green) he had an unhealed fracture to his femur. **Ex. B (L. Pearson Dep.) 23:14-16, 28:22-29:13, 34:21-24, 35:1-9; Ex. E (Karnick Dep.) 111:2-13.** When Lisa Pearson was getting Corban ready for the first day of school in 2018, she inadvertently dropped him due to his weight gain, which resulted in that injury. **Ex. B (L. Pearson Dep.) 28:22-24, 29-1-9; Ex. K (Corban Pearson Dep.) 61:4-19.**

**RESPONSE**: Disputed in part. Particularly, Corban's femur fractures were fully healed on August 14, 2019. (*See* Doc. 195 at ¶ 36).

22. Corban was 10 years old when he got his first motorized wheelchair. **Ex. B (L. Pearson Dep.) 93:13-18.** On June 28, 2016, Lisa Pearson took delivery of the Permobil F3 wheelchair. **Ex. B (L. Pearson Dep.) 128:1-7; Ex. H (Numotion Delivery Checklist).** This chair was involved in the subject incident on August 14, 2019. **Ex. B (L. Pearson Dep.) 130:5-24.** He had this first wheelchair until he received a new wheelchair after the incident. ***Id.*** **at 95:6-11.**

**RESPONSE**: Not in dispute.

23. On October 6, 2017, Corban weighed 125 pounds and had outgrown the seating within his power wheelchair due to weight gain from experimental drugs and steroids. **Ex. B (L. Pearson Dep.) 138:2-15; Ex. I (Seating/Mobility Evaluation, dated Oct. 6, 2017).** When Corban's chair was evaluated for modifications on October 5, 2017, Lisa Pearson signed that she was refusing "Anti-Tippers Devices," which the Numotion form states is recommended on all wheelchairs. **Ex. B (Lisa Pearson Dep.) 142:14-23); Ex. I (Customer Information Checklist; Rehab Equipment/Evaluation, dated October 5, 2017).**

**RESPONSE**: Not in dispute.

24. At the time of the incident, Corban weighed 176 pounds. **Ex. B (L. Pearson Dep.), 112:7-9; Ex. J (Seating/Mobility Evaluation dated Sept. 18, 2019).**

**RESPONSE**: Not in dispute.

25. The wheelchair used at the time of the incident did not have anti-tip wheels, and the wheelchair he received after the accident had anti-tip wheels. **Ex. B (L. Pearson Dep.) 98:3-24, 142:14-23, 149:16-19.**

**RESPONSE:** Not in dispute.

**August 14, 2019**

26. The date of the incident, August 14, 2019, was the first day of the school year. **Ex. B (L. Pearson Dep.) 33:4-6.** Corban was starting eighth grade at Wredling Middle School. **Ex. B (L. Pearson Dep.) 33:2-8.**

**RESPONSE:** Not in dispute.

27. That morning, Corban was at the end of his driveway with his mother waiting for Green to pick him up. **Ex. B (L. Pearson Dep.) 75:6-9.**

**RESPONSE:** Not in dispute.

28. Green lowered the wheelchair ramp to allow Corban to get on the bus and was told by Lisa Pearson that Corban was very independent and "likes to do things on his own." **Ex. D (Green Dep.) 35:20-39:10.** Lisa Pearson had prior conversations with Corban about turning off his wheelchair before being transported. **Ex. B (L. Pearson Dep.) 164:8-21.** Lisa Pearson instructed Karnick that Corban was in charge of operating his wheelchair. **Ex. E (Karnick Dep.) 102:7-19.**

**RESPONSE:** Plaintiffs dispute only that Lisa Pearson instructed Karnick that Corban was in charge of operating his wheelchair. (*See* Doc. 202 at Ex. E at 102:7-19).

29. Another student who used a wheelchair was also on the bus that morning. **Ex. K (Corban Pearson Dep.) 135:4-20.**

**RESPONSE:** Not in dispute.

30. Karnick secured Corban's wheelchair without incident and Green checked to ensure that the wheelchair was secure before starting her route. **Ex. E (Karnick Dep.) 28:20-29:3.** They had no problem securing Corban and his wheelchair to the back of the bus that morning. **Ex. D (Green Dep.) 46:15-47:3.** Corban stated the trip to school was uneventful and there were no

issues in securing his wheelchair on the route to school that morning—he got his wheelchair in position and turned it off, the bus monitor secured his wheelchair, and the wheelchair did not rock or feel loose. **Ex. K (Corban Pearson Dep.) 128:22-129:14, 131:2-16; *see also*, Ex. L (Morning Bus Video) at 8:06-8:08:27 a.m. and generally.**

**<u>RESPONSE</u>:** Plaintiffs dispute that Green checked to ensure that the wheelchair was secure before starting her route because she picked him up mid-route. Plaintiffs further dispute that the wheelchair was properly secured in the morning. (*See* Doc. 202 at Ex. E, 28:20-29:3; *see* Doc. 202 at Ex. N at 90:11-91:3).

31. In the afternoon of August 14, 2019, after Corban positioned himself into the rear of the bus, Karnick stood in front of Corban to secure the front wheels of the wheelchair. **Ex. D (Green Dep.) 53:16-54:2; Ex. K (Corban Pearson Dep.) 133:11-15; Ex. M (Afternoon Bus Video) at 03:44:50 p.m.** Karnick took steps to secure Corban's wheelchair by pulling the retractable straps from the bus floor and latching them to the bottom front of the wheelchair, then repeating the process by latching the straps to the back of the wheelchair, without any trouble. **Ex. M (Afternoon Bus Video) at 03:44:56 p.m.; Ex. E (Karnick Dep.) 36:19-39:2; Ex. D (Green Dep.) 55:1-13.**

**<u>RESPONSE</u>**: Plaintiffs dispute that the wheelchair was properly secured, let alone that it was secured without any trouble. (*See* Doc. 202 at Ex. M at 3:40 PM - 3:50 PM).

32. Karnick asked Green to come to the back of the bus to check that all four floor straps were securely fastened to the wheelchair, which she did. **Ex. E (Karnick Dep.) 39:11 40:22; Ex. D (Green Dep.) 56:14-57:6, 64:19-65:20; Ex. M (Afternoon Bus Video) at 03:45:45 p.m.** On Green's inspection, Green believed Corban's wheelchair was secured before she walked back to the bus to start driving the afternoon route. **Ex. D (Green Dep.) 59:23-60:20, 98:10-13, 144:18-**

**145:13.**

**RESPONSE:** Plaintiffs dispute that Karnick called Green to the back of the bus to check that the straps were securely fastened. (*See* Doc 202 at Ex. M at 3:45 PM). Plaintiffs further dispute that Green believed Corban's wheelchair was secured before she walked back to the bus to start driving the afternoon route. (*See* Doc 202 at Ex. D p. 62:2 – 70:9; *see also* Doc 202 at Ex. E p. 118:21-119:4).

33. The steps to secure the wheelchair took almost 5 minutes. **Ex. M (Afternoon Bus Video) at 03:44:50-03:49:06 p.m.**

**RESPONSE**: Plaintiffs dispute the assertion that the wheelchair was secured. (*See* Doc. 195 at ¶ 31).

34. After the bus started moving, Corban testified that he said to Karnick that his wheelchair "felt tippy," and Karnick came and looked at the straps and put the wheelchair back in a flat position. **Ex. K (Corban Pearson Dep.) 150:16-152:11, 156:9-157:2; Ex. M (Afternoon Bus Video) at 04:06:55 p.m.**

**RESPONSE**: Not in dispute.

35. The bus continued on its route and came to a stop prior to Green making a left turn onto Bocum Road, and Corban's wheelchair tipped forward. **Ex. M (Afternoon Bus Video) at 4:15:15-4:16:03 p.m.; Ex. E (Karnick Dep.) 53:20-54; Ex. D (Green Dep.) 78:16-79:7.**

**RESPONSE:** Plaintiffs dispute that the bus actually came to a stop before the wheelchair tipped over. (*See* Doc. 202 at Ex. M at 4:15:15-3:16:03).

36. Unbeknownst to Karnick, Corban had used the joystick to move his chair forward before his wheelchair tipped. **Ex. M (Afternoon Bus Video) at 04:06:34 p.m.; Ex. E (Karnick Dep.) 107:7-108:12; 119:17-120:2.**

**RESPONSE:** Not in dispute.

37. Within seconds after Corban's wheelchair tipped, Karnick got up from where she was seated and yelled up to Green that the wheelchair had tipped over. **Ex. E (Karnick Dep.) 58:2-6, 60:2-61:6; Ex. D (Green Dep.) 78:16-79:7; Ex. M (Afternoon Bus Video) at 4:16:04 p.m.** Green said, "Pam, I thought you said you had both of them on!" **Ex. M (Afternoon Bus Video) at 4:16:03 p.m.; Ex. D (Green Dep.) 78:5-9.** Karnick replied, "It was in, all of them were in!" **Ex. M (Afternoon Bus Video) at 4:16:14 p.m.**

**RESPONSE**: Not in dispute.

38. Corban did not fall out of the wheelchair, but the back of the wheelchair had tipped up. **Ex. D (Green Dep.) 81:12**. After the wheelchair had tipped, all four straps were still connected from the wheelchair to the floor and had extended and locked themselves (similar to how a seat belt locks). **Ex. E (Karnick Dep.) 55:8-56:16.**

**RESPONSE:** Plaintiffs dispute that the chair was properly secured. (See Doc. 195 at ¶ 31).

39. Green then pulled the bus over to the side of the road and went to the rear of the bus where she spent several minutes assisting Karnick to try and pull Corban and his wheelchair into an upright position. **Ex. D (Green Dep.) 79:8-85:13; Ex. M (Afternoon Bus Video) at 4:16:56-4:22:04 p.m.**

**RESPONSE**: Not in dispute.

40. Green and Karnick were able to get the four wheels of the wheelchair down on the bus floor, so Green then walked back to the front of the bus to drop off a crying student whose driveway was only a half-block away, and she then turned the bus around and parked it in a safe area where she could call for emergency assistance. **Ex. D (Green Dep.) 85:14-86:10, 90:6-15, 94:14-97:10, 108:2-111:7; Ex. M (Afternoon Bus Video) at 4:28:47 p.m.**

**RESPONSE:** Disputed as to all material assertions, as Green continued driving until Corban's wheelchair tipped a second time. (*See* Doc. 202 at Ex. M at 4:15 PM to-4:28 PM).

41. Within about seven minutes, paramedics arrived and were able to lift Corban and sit him upright in his wheelchair. **Ex. D (Green Dep.) 112:22-113:5; Ex. M (Afternoon Bus Video) at 4:35:29 p.m.** Karnick stayed with Corban until EMS arrived to assist. **Ex. E (Karnick Dep.) 68:19-69:2.** She did not believe he was injured. ***Id.* at 109:19-22, 110:9-20.**

**RESPONSE:** Plaintiffs dispute that paramedics arrived within 7 minutes. (*See* Doc. 202 at Ex. M at 4:35 PM).

42. During her time working as a bus monitor for District 303 and prior to the occurrence involving Corban, Karnick never experienced any other occasion where a wheelchaired student became unsecured. **Ex. E (Karnick Dep.) 84:24-90:13-19**.

**RESPONSE**: Not in dispute.

43. Karnick stated that, based on her training, the shoulder strap was to be fastened. and if she had known the shoulder strap was not secure prior to the subject incident, she would have gotten up and secured it. **Ex. E (Karnick Dep.) 50:22-51:2; 83:20-85:10.** She did not recall that she had any difficulty with the shoulder strap on the date of the incident. **Ex. E (Karnick Dep.) 88:16-18.**

**RESPONSE:** Plaintiffs dispute that Karnick did not know the shoulder strap was secured as she attempted to secure it and released it without doing so. (*See* Doc. 202 at Ex. M at 3:47 PM – 3:49 PM).

**District 303's Buses and Safety Equipment**

44. District 303's buses are inspected by the State of Illinois at a frequency that is determined by the mileage of the bus and documented by a sticker on the windshield. **Ex. C**

**(Primdahl Dep.) 81:12-82:83:9.** The driver also inspects the bus and its safety equipment daily. **Ex. C (Primdahl Dep.) 59:14-60:2, 84:5-17.**

**RESPONSE**: Not in dispute.

45. Bus drivers and bus monitors are trained by District 303 to use a four-point tie-down system to secure a wheelchair and its passenger, and Primdahl was not aware of any time when it was not possible to use a four-point tie-down system on a District 303 bus or where the tie-down system was not functioning properly when it was sent out on its route. **Ex. C (Primdahl Dep.) 57:6-20.** If a tie-down system is not functioning properly on the bus, the bus drivers and monitors are trained to alert the office. **Ex. C (Primdahl Dep.) 57:21-58:7.**

**RESPONSE**: Disputed as to all material assertions. (*See* Doc. 230 at ¶ 1).

46. Because a tie-down system is removable, if the equipment is malfunctioning the issue can be resolved by replacing the system. **Ex. C (Primdahl Dep.) 58:8-20.**

**RESPONSE:** Not in dispute.

47. In Primdahl's experience, a tie-down system has never malfunctioned before, but they have been replaced for maintenance. **Ex. C (Primdahl Dep.) 58:18-60:2**

**RESPONSE:** Not in dispute.

48. Timothy Hicks, P.E., Plaintiffs' retained expert, has no opinions against Terry Primdahl. **Ex. N (Hicks Dep.) 7:24-8:6.** His opinion is that District 303 was "negligent," but he could not say whether there was any negligence with respect to the equipment that District 303 provided or if the purported negligence of District 303 only arose from the actions of its employees on the bus with respect to the shoulder strap. ***Id.* at 117:10-18, 119:21-121:3.**

**RESPONSE**: Plaintiffs dispute that these assertions fully state Timothy Hicks' opinion regarding the District's negligence. (*See* Doc. 202 Ex. N at 115:9-120:23).

49. Hicks did not read Karnick's or Green's depositions. ***Id.* at 17:20-18:9.** Notwithstanding, his opinions as to Karnick and Green are that they were "negligent" in not securing Corban. ***Id.* at 84:14-20, 119:21-120:23.**

**RESPONSE**: Not in dispute.

50. District 303's retained expert, Daniel E. Toomey, Ph.D, who specializes in vehicle restraint systems (among other related areas), explained that the shoulder strap is part of a three-point belt and it, along with the rest of the three-point belt, is intended to limit the movement of the person in the wheelchair, but it is not rigid and does not prevent the person from moving forward. **Ex. O (Toomey Dep.) 135:3-136:17; *see also* Ex. P (Toomey Curriculum Vitae).**

**RESPONSE:** Not in dispute as to the content of Toomey's testimony regarding his opinions, but contrary opinions are also present in the record. (*See* Doc. 202 Ex. N at 132:7-133:3).

Dated: March 4, 2025

Respectfully submitted,

By: *Nitika Suchdev*
One of Plaintiffs' Attorneys

James J. O'Hagan
Kevin M. O'Hagan
Bryan W. White
Nitika Suchdev
O'HAGAN MEYER LLC
One E. Wacker Dr., Suite 3400
Chicago, Illinois 60601
PH: 312.422.6100 | FX:
312.422.6110
johagan@ohaganmeyer.com
kohagan@ohaganmeyer.com
bwhite@ohaganmeyer.com
nsuchdev@ohaganmeyer.com

Sam L. Amirante
AMIRANTE LAW OFFICES, P.C.
770 Lee Street, Suite 201
Des Plaines, Illinois 60016
PH: 847.934.7444
FX: 847.934.7474
amirantelawoffices@gmail.com

**CERTIFICATE OF SERVICE**

This is to certify that on March 4, 2025, I electronically filed **PLAINTIFFS' RESPONSE TO COMMUNITY UNIT SCHOOL DISTRICT 303 DEFENDANTS' STATEMENT OF FACTS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ Nitika Suchdev*
Nitika Suchdev
O'HAGAN MEYER LLC
One E. Wacker Dr., Suite 3400
Chicago, Illinois 60601
PH: 312.422.6100
FX: 312.422.6110
nsuchdev@ohaganmeyer.com