**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHRISTIN P. PEARSON, on his own and on behalf of his minor child, CORBAN PEARSON, and LISA PEARSON, on her own and on behalf of her minor child, CORBAN PEARSON, | ) ) ) ) ) | Case No. 1:20-cv-05096 |
| | ) | |
| Plaintiffs, | ) | Judge John Robert Blakey |
| | ) | |
| v. | ) | |
| | ) | |
| COMMUNITY UNIT SCHOOL DISTRICT 303, ANTOINETTE L. GREEN, PAM KARNICK, TERRY PRIMDAHL, and UNITED SEATING AND MOBILITY, L.L.C., a Missouri limited liability company, d/b/a NUMOTION | ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

On August 14, 2019, Corban Pearson sustained injuries when his wheelchair tipped over on him while he was riding home from middle school on the school bus. Corban, through his parents Lisa and Christin, sued the school bus driver, Antoinette Greene; the school bus aide, Pam Karnick; the School District's Director of Transportation, Terry Primdahl; the school district, Community Unit School District 303; and the wheelchair supplier, Numotion. The Pearsons allege negligence and willful and wanton misconduct, and violations of the Americans with Disabilities Act, the Individuals with Disabilities Education Act, and the Rehabilitation Act. The case is before the Court on Plaintiffs' three motions to strike and three motions for summary judgment, as well as motions for summary judgment filed by Defendants

1

Community Unit School District 303, Terry Primdahl, Antoinette Green, and Pamela Karnick and by Defendant Numotion.  The Court resolves these motions below.

## I.      Factual Background

After the first day of the 2019/2020 school year at Wredling Middle School, on August 14, 2019, Corban Pearson, who requires a wheelchair to get around, loaded onto the school bus to be transported home.  [227] ¶ 2; [188] ¶ 6.[1]  Antoinette Green drove the school bus, and Pam Karnick worked as the bus's aide.  The District employed Green to transport students from their homes to school and back again in a safe manner.  [227] ¶ 17.  And it employed Karnick as a bus aide to supervise students and assist the driver with boarding, seating, and securing students.  *Id.* ¶ 20.  Both were tasked on August 14, 2019, with securing Corban's wheelchair in place on the bus.  *See id.* ¶ 19.

Corban required a large wheelchair, and the Pearsons purchased this particular chair—the Permobil Corpus F3 electric wheelchair—in 2016 from United Seating and Mobility LLC (hereinafter, "Numotion").  *See* [188] ¶¶ 1, 2; [190] at 6. The chair weighed about 380 pounds, was mechanically limited to not exceed a speed of 2 to 5 miles per hour, and was not equipped with anti-tippers.  *See* [188] ¶¶ 17, 41. Karnick had never previously worked on a school bus with a wheelchair as large as Corban's, and it was hard for her to get her hands behind the chair.  *Id.* ¶¶ 18, 19. When attempting to secure Corban in place, Karnick summoned Green to the back of

---

[1] The Court draws these facts from the parties' Statements of Material Facts and Responses to those Statements, as well as from the exhibits attached to the parties' submissions, including the surveillance camera footage from the school bus (designated Exhibit L on the docket), which captured the entirety of the events at the center of this dispute.

the bus to help her evaluate how best to use the bus's "securement straps," the straps on the floor that, when locked down, prevent the chair from moving during transit. *Id.* ¶¶ 20, 28. In addition to the securement straps, the school bus was outfitted with a three-point harness seat belt designed to keep the wheelchair and its occupant restrained. *Id.* ¶ 30. Green released the shoulder strap portion of the bus's restraint system without securing it to the floor, [227] ¶ 21, meaning the three-point harness belt went unutilized. [188] ¶¶ 21, 25, 26. Green believed Karnick would secure the strap. [227] ¶¶ 21, 23. And Karnick believed, based upon her training and experience, that the bus should not move without the harness being secured to the wheelchair. *Id.* ¶ 24.

After Green and Karnick finished with Corban's wheelchair, Green returned to the front of the bus to start the drive; the parties dispute whether Green and Karnick secured the floor straps, but there is no dispute that, on August 14, 2019, Green drove the bus with the harness belt unsecured. *Id.* ¶¶ 22, 26; [229] at 16. Just as the bus started moving, Karnick told Green to be careful going around corners. [249] ¶ 3. Sometime after the ride began, Corban powered on his wheelchair and moved it forward. [231] ¶ 36. And then, later on in the trip, Green braked and Corban's chair tipped forward on top of him. *See* [249] ¶ 4.

Green stopped the bus, and Green and Karnick pulled Corban's body and the chair to try to get him into an upright position. *Id.* ¶ 5. Green exclaimed to Karnick that the wheelchair could not have been strapped in because "those things lock on the floor" and "they don't move because they lock." *Id.* ¶ 6. When they could not get the

3

chair back up, Green resumed the drive and dropped off another child. *Id.* ¶ 7. Green remarked that Corban "can't sit like that" and suggested calling for help. *Id.* ¶ 8. Green, who was driving, applied the brakes again, and again Corban's chair tipped forward. *Id.* ¶ 9. Karnick had been positioned in front of Corban since the first tipping event, so she had her hands on the arms of the wheelchair when Corban's wheelchair tipped this second time. [227] ¶ 27. Karnick exclaimed "You just slammed the brakes hard!" [249] ¶ 10. After this, the two finally called 911. Thirteen minutes elapsed between the initial tipping of Corban's chair and the dialing of 911. *Id.* ¶ 11. According to Director of Transportation Terry Primdahl, Green and Karnick did not follow protocol when they continued to drive after the first tip without Corban fully in his wheelchair. *Id.* ¶ 13.

As a result of the August 14, 2019, drive, Corban sustained injuries and suffered from anxiety and post-traumatic stress disorder, and he missed six months of school. [227] ¶ 28; [249] ¶¶ 20–22. Before the accident, he had ridden the bus for years and never before experienced a tip-over event. [188] ¶ 36. Since the accident, Corban, who used to love riding the bus, has refused to travel on the school bus and will "freak out" whenever someone mentions the accident or anything related to possibly going on a school bus. [249] ¶¶ 18–19.

The parties dispute multiple factual issues in this case, and to support their positions they each retained multiple experts.

First, the parties dispute the adequacy of Defendants' training. Plaintiffs' expert, Timothy Schoolmaster, opines that the District failed to properly train its

employees. *Id.* ¶¶ 15–17. Relatedly, Plaintiffs complain that, even though Terry Primdahl served as Green and Karnick's direct supervisor, in practice she failed to supervise or evaluate either individual in any way. *Id.* ¶ 12.

The parties dispute the amount of training Green received prior to the date of the incident. *See id.* ¶ 15. Plaintiffs stress that in her nine years driving the special transportation bus, Green never received any training on how to secure a wheelchair. [229] at 23; [230-1] 23:20–24. Schoolmaster points out that, although the District sent Green on ride-along observations as part of her training, the form used to evaluate Green, on two separate occasions, had the lines for special education crossed out and had "NA" written over them," indicating that the ride-alongs included no training in handling wheelchairs on buses. [249] ¶ 15. The District, however, maintains that it provided drivers with training relating to special education students following the State's curriculum and it also provided an 83-page training booklet to both Green and Karnick when the District assigned their bus routes. [227] ¶ 18. Additionally, the District furnished a training article entitled "Wheelchair Transport Safety," which identifies certain "dos" and "don'ts." *Id.*

Next, the parties dispute how the accident occurred. Numotion's expert, Miriam Manary, opines that if Corban could move his wheelchair forward on the bus, Green and Karnick failed to properly secure the rear tie-down straps. [188] ¶ 60. Plaintiffs' expert, Timothy Hicks, opines that Corban's injuries stemmed from Green's heavy braking and Green and Karnick's failure to properly secure Corban or his chair; given this, he opines that the inclusion of "anti-tip support wheels" on the

chair likely would not have prevented Corban's wheelchair "from tipping and rotating forward onto the bus floor." [188] ¶¶ 31, 37, 39. The District and Terry Primdahl's expert, Daniel Toomey, opines that if Green and Karnick had properly used the bus's Q'Straint securement system, the wheelchair could not have tipped, *id.* ¶ 50; in fact, Toomey opines that if they had properly secured even one of the rear straps and locked the retractor, the chair would not have flipped over. [227] ¶ 31. In contrast to Hicks, Toomey opines that the braking event was "minor" and that anti-tippers would have prevented the accident. [249] ¶¶ 24–26.[2]

As to the anti-tippers, the parties dispute whether anti-tippers were the best option for Corban at the time the Pearsons purchased the wheelchair. *See* [188] ¶ 75. Additionally, Plaintiffs and Numotion disagree about who is to blame for the failure to outfit the chair with anti-tippers. Numotion representative David Cingano, who helped the Pearsons with their wheelchair order, recommended possible necessary features and discussed anti-tippers, but claims that the parties jointly decided which features to include and which to omit. [227] ¶¶ 32–34. Lisa Pearson claims she relied upon Cingano's greater expertise in making decisions, and she denies that Cingano told her about anti-tippers. Cingano testified that his practice was to always mention them, and he believes he did so in this case. *Id.* ¶ 11. Relatedly, when she ordered the chair, Lisa Pearson signed a form indicating that she had refused anti-tippers and purportedly released Numotion from liability based upon the selection (and

---

[2] Numotion disagrees with this conclusion and seeks to strike it for lack of foundation and under *Daubert.* [247] ¶ 24–25.

rejection) of features (though Pearson disputes the effect of her signature on this form). *See* [249] ¶ 29; [202-9].

## II.        Procedural History

Plaintiffs initially filed this action in state court, and the District, Terry Primdahl, Antoinette Green, and Pam Karnick (collectively, "District Defendants") removed the case to federal court on August 28, 2020. [5]. While this case remained pending, Green and Karnick were both criminally charged with child endangerment in the Circuit Court of Kane County. *See* [16]; [33] at 4. Based upon those proceedings, on September 15, 2020, the Court stayed this matter, *see* [20]; [35] at 3.[3] The Court lifted the stay on July 22, 2021, [39], and the District and Primdahl then brought in Numotion through a Third-Party Complaint for contribution, based upon Numotion's failure to provide anti-tippers on Corban's wheelchair. [49] at 7–9. Numotion cross claimed for contribution. [94].

On January 23, 2023, Plaintiffs filed their first amended complaint. [84]. Defendants moved to dismiss, and on September 11, 2023, this Court dismissed their ADA and Rehabilitation Act claims against Defendants Green, Karnick, and Primdahl because those Acts do not allow for recovery against individuals. [110]. At that time, the Court declined to dismiss Plaintiffs' IDEA claim against the individual District Defendants, because "individual liability is not necessarily foreclosed under the IDEA." *Id.* (citing *Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015)).

---

[3] On April 11, 2023, a jury found Green guilty of child endangerment. [188] ¶ 10.

Plaintiffs filed the operative complaint, the third amended complaint ("TAC") on December 6, 2024. [182]. Defendants separately answered the TAC, each alleging affirmative defenses. *See* [184], [185], [186], [187]. Plaintiffs move to strike, and they also move for summary judgment, as to several of those defenses.

## III.  Plaintiffs' Motions to Strike

## A.  Legal Standard

Plaintiffs seek to strike various affirmative defenses asserted by Defendants. An affirmative defense, made after a plaintiff has pled his *prima facie* case, allows a defendant to admit the allegations made against it while still avoiding liability due to an excuse, justification, or other negating matter. *Reed v. Columbia St. Mary's Hosp.*, 915 F.3d 473, 477 n.1 (7th Cir. 2019). Federal Rule of Civil Procedure 12(f) governs motions to strike and provides that a court may strike "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *See also* Fed. R. Civ. P. 8(c), 15.

The Seventh Circuit has not decided "whether the Federal Rules require defendants to articulate the factual basis for defenses in their answers, like plaintiffs must do for complaints under *Twombly* and *Iqbal*." *Aylin & Ramtin, LLC v. Barnhardt*, No. 19-cv-3402, 2022 WL 658786, at * 2 (N.D. Ill. March 4, 2022). Some courts in this district have allowed a defendant to rely on his answer or responsive brief to supply the affirmative defense's basis. *See, e.g., Codest Eng'g v. Hyatt Int'l Corp.*, 954 F. Supp. 1224, 1231 (N.D. Ill. 1996); *State Farm & Cas. Co. v. Elextrolux Home Prods.*, No. 10-cv-7651, 2011 WL 133014, at *2 (N.D. Ill. Jan. 14, 2011).

Generally, courts disfavor motions to strike and will ordinarily, in their discretion, deny them unless the portion of the pleading is prejudicial. *See Connectors Realty Grp. Corp. v. State Farm Fire & Casualty Co.*, No. 19-cv-743, 2021 WL 1143513, at *2 (N.D. Ill. Mar. 25, 2011). Still, courts will strike affirmative defenses that remain "insufficient on their face." *City of Chicago v. DoorDash, Inc.*, 636 F. Supp. 3d 916, 919 (N.D. Ill. 2022) (citing *Heller Fin., Inc. v. Midwhey Powder Co.*, 883 F.2d 1286, 1294 (7th Cir. 1989)); *Intercon Solutions, Inc. v. Basel Action Network*, 969 F. Supp. 2d 1026, 1059 (N.D. Ill. 2013) (While "motions to strike are generally disfavored, courts should strike affirmative defenses that fail to meet basic pleading requirements, are clearly mistitled, or are redundant and add unnecessary clutter to the case." And, "bare legal conclusions are never sufficient and must be stricken.").

An affirmative defense may also be struck if the defendant forfeits it. This happens when a defendant fails to preserve the defense by pleading it. *Burton v. Ghosh*, 961 F.3d 960, 964–65 (7th Cir. 2020). Likewise, simply responding to an amended complaint does not automatically permit a defendant to resurrect a waived affirmative defense, because "the invitation to answer an amended complaint should be understood as permission to plead *in response* to the amendments . . . unless leave is expressly given to raise new defenses unrelated to the amendments." *Id.* at 968.

Notwithstanding this, a court may still "exercise its discretion to allow a late affirmative defense if the plaintiff does not suffer prejudice from the delay." *Burton*, 961 F.3d at 965 (citing *Global Tech. & Trading, Inc. v. Tech Mahindra Ltd.*, 789 F.3d 730, 732 (7th Cir. 2015)). To be sure, a "defendant should not be permitted to 'lie

9

behind a log' and ambush a plaintiff with an unexpected defense.'" *Venters v. City of Delphi*, 123 F.3d 956, 968 (7th Cir. 1997) (quotation omitted) (involving a defendant who makes its "first and only mention of the statute of limitations" defense "in their reply memorandum in support of the motion for summary judgment"). Though, courts should exercise their discretion so that, "the rule that forfeits an affirmative defense not pleaded in the answer (or by an earlier motion)" is "not to be applied rigidly" and a failure to plead an affirmative defense works as a forfeiture "only if the plaintiff is harmed by the defendant's delay in asserting it." *Reed*, 915 F.3d at 478 (quoting *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 436 (7th Cir. 2014)).

As examples, in *Burton v. Ghosh*, the court rejected an untimely *res judicata* defense since it precluded the plaintiff from seeking relief from the earlier judgment and unexpectedly diverted counsel's attention away from the merits of the case to searching through years of litigation history to determine if the defense had been waived. *Burton,* 961 F.3d at 970. Similarly, in *Reed*, the court blocked a hospital's attempt to raise a religious exemption defense to an ADA claim for the first time at the summary judgment stage because, not only were the facts supporting this affirmative defense within the defendant's control, the evidence also did not directly controvert the plaintiff's proof. 915 F.3d at 475, 478–80.

With these standards in mind, the Court considers the challenged defenses.

**B.    Green's Affirmative Defenses**

Plaintiffs move to strike Green's Seventeenth Affirmative Defense as inadequately pled. Green's Seventeenth affirmative defense reads as follows:

10

"That before and at the time and place of the occurrence alleged in Plaintiffs' Complaint, Plaintiffs knew, understood, and appreciated the risks and hazards involved in Corban Pearson's transportation on District 303's bus, meaning that their claims against Green are barred by their assumption of the risks."

[187] at 29.

Green's defense demonstrates her reliance on a theory of implied assumption of the risk which only requires a showing that "the risk of harm is not created by the defendant but is inherent in the activity which the plaintiff has agreed to undertake." *Clark v. Rogers*, 484 N.E.2d 867, 869 (Ill. App. Ct. 1985). Here, that activity is riding a bus. Green need not list the "general risks associated with a motor vehicle." [224] at 5. Therefore, to the degree a particular risk is not created by defendants and only inherent in riding a bus, this defense is sufficiently alleged.[4]

## C.     Numotion's Affirmative Defenses

Plaintiff moves to strike several of Numotion's affirmative defenses for failing to comply with pleading standards. [193].

Numotion's Third Affirmative defense reads:

"So as to not waive the defenses, Numotion states that all claims as to Numotion are barred and/or limited in whole or in part by Illinois's Product Liability Act 735 ILL. COMP. STAT. 5/2-621."

Neither Numotion's answer, nor the response to the motion to strike, explain the basis for this affirmative defense. This bare legal conclusion will be stricken.

Numotion's Fifth Affirmative Defense reads:

---

[4] Plaintiffs also challenge Green's Twentieth Affirmative Defense; Green provided no response, *see generally* [226], and this Court thus deems the defense waived. *Palmer v. Marion County*, 327 F.3d 588, 597 (7th Cir. 2003).

11

> "All claims as to Numotion are barred because Plaintiffs' injuries, if any, were actually or proximately caused, in whole or in part, by the intervening and superseding conduct of Third-Party Plaintiffs, other parties, and non-parties to this action or events that were extraordinary under the circumstances, not foreseeable in the normal course of events, or independent of or far removed from Numotion's conduct or control."

Numotion entered the case as a third-party defendant solely for the purpose of contribution, which they themselves counterclaimed against the District Defendants. [49]; [94]; [111]. As such, no prejudice or surprise exists for Plaintiffs, and the Court denies the motion to strike.

Numotion's Sixth Affirmative Defense reads:

> "So as to not waive the defenses, Numotion's states that all claims as to Numotion may be barred, in whole or in part, by the doctrines of waiver, laches, or estoppel."

Numotion, in its motion to strike briefing, makes no attempt to explain or defend its laches defense. [225] at 4–5; [242] at 4. Thus, Numotion waives it. Additionally, in explaining its waiver and estoppel arguments, Numotion's reasoning merely duplicates its Twelfth Affirmative Defense: release. *Cf.* [225] at 8. Therefore, the Court also grants this motion to strike as duplicative.

Numotion's Ninth Affirmative Defense reads:

> "The claims asserted in the Third-Party Complaint are barred because the risks, if any, associated with the use of the wheelchair are outweighed by the device's utility."

Here, Numotion reproduces the test used in negligent design cases that the plaintiff bears the burden of proving. *See Suarez v. W.M. Barr & Co.*, 842 F.3d 513, 520 (7th Cir. 2016). As stated above, affirmative defenses preclude liability *after* a plaintiff has established his *prima facie* case. Therefore, the Court strikes this improper

affirmative defense. The Defendant, of course, remains free to argue the Plaintiffs have not met their burden.

Numotion's Tenth Affirmative Defense reads:

"The claims set forth in the Complaint are barred because the alleged injuries and damages, if any, were caused by medical conditions, disease, illness, or processes (whether pre-existing or contemporaneous) unrelated to the wheelchair or the incident."

Similarly, this "affirmative defense" merely attacks the Plaintiff's ability to establish their *prima facie* case. Again, the Court grants the motion to strike, but Numotion remains able to argue Plaintiffs have failed to establish causation.

Numotion's Eleventh Affirmative Defense reads:

"Plaintiffs' claims may be barred, in whole or in part, by the contributory or comparative negligence of plaintiffs."

Nothing in Numotion's answer, however, indicates contributory fault, and instead it relies upon District Defendants establishing this affirmative defense.[5] As this does not appear to be a defense Numotion had adequately pled or intends to present itself, this defense will be stricken.

Numotion's Twelfth Affirmative Defense reads:

"Plaintiffs claims against Numotion are barred according to the doctrine of release."

---

[5] The School District Defendants "maintain that the accident was caused when Corban activated his wheelchair and moved the location of the wheelchair during his bus transit thereby loosening the securement devices and enable the tipping. The School District has set forth numerous witness depositions, namely Defendants Green and Karnick, who testified that Corban moved his wheelchair just prior to the occurrence. . . . Numotion should be allowed to advance the affirmative defense of contributory fault considering that the fact finder might determine that Corban moved his wheelchair and thereby caused or contributed to cause the accident." [225] at 7–8 (internal citations omitted).

13

The Court would typically strike a bare conclusion like this, but Numotion cites Lisa Pearson's denial of anti-tipper devices, [185] ¶ 44, and its response supports this fact by quoting and attaching as an exhibit the signed document containing Lisa Pearson's denial which states: "Your signature means . . . for refusing anti-tippers . . . you release and hold harmless Numotion . . . ." [225] at 6, 8; [225-1]. For these reasons, the Court denies this motion to strike.

Numotion's Thirteenth Affirmative Defense reads:

"Plaintiffs' injuries were caused by actions or omissions of Third-Party Plaintiffs' or other third party's over whom Numotion does not control."

This affirmative defense duplicates Numotion's Fifth Affirmative Defense. Therefore, the Court grants Plaintiff's motion to strike.

## D.    Affirmative Defenses Based Upon the Tort Immunity Act

Though Plaintiffs filed no formal motion to strike against any of the District Defendants' Tort Immunity defenses, they do, in fact, seek such relief from this Court. In the District Defendants' motion for summary judgment, they rely upon Tort Immunity affirmative defenses, specifically Illinois School Code § 24-24 and §§ 2-201 and 3-108 of the Tort Immunity Act, not disclosed prior to the filing of their motion. *See* [201] at 5–10; [229] at 3.

Defendants offer no explanation as to why they asserted these defenses so late. Regardless, Plaintiffs fail to meet the requisite showing of prejudice. All the facts needed to establish these affirmative defenses were clear from the beginning of litigation and were alleged by Plaintiffs in their own pleadings. Plaintiffs were also aware of District Defendants' partial reliance on the TIA given their answers.

14

Additionally, Plaintiffs in their own TAC address the School Code within their negligence count. *See* [182] ¶ 46(f), (g), (n), (o). As such, District Defendants have not merely asserted the argument in their reply brief (without giving opportunity for response), such as in *Venters*, 123 F.3d at 968, nor relied on a defense whose factual underpinnings fall outside the Plaintiffs' control, such as in *Reed*, 915 F.3d at 478–80. Instead, Plaintiffs had notice of the theory and remain able to properly defend against it. Therefore, the Court will allow the District Defendants to argue these defenses.[6] Defendants shall amend their answers to comport with their arguments.

E.      **Affirmative Defenses Based Upon Corban's Negligence**

The District and Terry Primdahl (collectively, "Board Defendants") assert the contributory negligence of Corban Pearson in their Second Affirmative Defense, [184] at 26–27, and Defendant Green asserts it in her Twenty-First Affirmative Defense, [187] at 32–33. Plaintiffs argue these Defendants improperly (without seeking leave of Court) raised this new defense outside the scope of their amendments to their TAC. [191] at 3–4; [192] at 5–6.

Here again, however, Plaintiffs have not demonstrated prejudice. Plaintiffs previously argued that the issue of Corban Pearson's contributory negligence "is not a new fact – it is an essential element of Plaintiffs' allegations of negligence. It is an element that Plaintiffs will be required to prove at trial, whether it is contained in

---

[6] Plaintiffs briefly mention that Illinois courts would deem a TIA defense forfeited if not pled as an affirmative defense. [229] at 3–4. This does not control here. While a federal court in diversity applies state law for the legal and factual sufficiency of an affirmative defense, *Williams v. Jader Fuel Co.*, 944 F.2d 1388, 1400 (7th Cir. 1991), the federal principle covering the waiver of affirmative defenses governs as a procedural rule of general applicability, *Herremans v. Carrera Designs, Inc.*, 157 F.3d 1118, 1122–23 (7th Cir. 1998); *see also Hanna v. Plumer*, 380 U.S. 460, 470 (1965).

15

the Second Amended Complaint or not." [179] ¶ 30. The question of Corban's contributory negligence, if any, represents an integral issue central to the underlying claim, and it factually remains well within the Plaintiffs' ability to address at trial. As Defendants represent, "all parties have had ample opportunity to explore Corban's conduct on the bus just prior to his falling." [222] at 3. For these reasons, the Court exercises its discretion to deny the motion to strike.

## IV.    Summary Judgment
## A.    Applicable Legal Standards

Plaintiffs have filed three motions for summary judgment against the Board Defendants, Green, and Karnick respectively. [196], [197], [198]. A court may grant summary judgment for any claim or defense if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). At this stage, a court views the record in the light most favorable to the non-moving party. *McDonald v. Hardy*, 821 F.3d 882, 888 (7th Cir. 2016). A genuine dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This occurs both when the parties dispute a material fact and when parties dispute the reasonable inferences arising from the undisputed facts. *Harley-Davidson Motor Co. v. PowerSports, Inc.*, 319 F.3d 973, 989 (7th Cir. 2003). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party has carried its burden, "its opponent must do more than simply show that there

16

is some metaphysical doubt as to the material facts. Instead, the non-movant must set forth specific facts demonstrating a genuine issue for trial." *Hutchinson v. Fitzgerald Equip. Co.*, 910 F.3d 1016, 1021–22 (7th Cir. 2018) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## B. Defenses Based Upon The Pearsons' Contributory Negligence

The Board Defendants' First Affirmative Defense, [184] at 24–26, Green's Third and Nineteenth Affirmative Defenses, [187] at 23–25, 30, and Karnick's First Affirmative Defense, [186] at 24–25, all allege the contributory negligence of Christin and Lisa Pearson.

Comparative negligence lessens liability for a defendant's negligent and willful and wanton conduct (if that conduct was committed recklessly rather than intentionally). *Poole v. City of Rolling Meadows*, 656 N.E.2d 768, 771 (Ill. 1995). A jury typically decides the question of comparative negligence, *see Parsons v. Norfolk S. Ry. Co.*, 88 N.E.3d 45, 57 (Ill. App. Ct. 2017), and a court will only decide the issue if it concludes that no reasonable jury could find that the plaintiff engaged in contributory negligence. *Reyes v. Menard, Inc.*, No. 21-cv-359, 2022 WL 2757666, at *4 (N.D. Ill. July 14, 2022) (quoting *Parsons v. Carbondale Township.*, 577 N.E.2d 779, 785 (Ill. App. Ct. 1991)); *see also Dayton v. Pledge*, 128 N.E.3d 1120, 1132 (Ill. App. Ct. 2019).

Here, factual disputes exist concerning the lack of anti-tippers on Corban's wheelchair and who may be legally responsible for the decision to forego that specific safety feature. On the current record, a jury could reasonably find that Lisa and/or

17

Christin Pearson remained negligent in one or more respects (in failing to train Corban concerning the use of his chair, in declining to equip the chair with anti-tippers) and that such acts contributed to Corban's accident. Although the Pearsons blame David Cingano and Numotion for not putting anti-tippers on Corban's chair, Numotion blames Plaintiffs for not putting anti-tippers on Corban's chair (and the release form potentially supports Numotion's position)*, see* [196] at 3–4; [226] at 5–7, and thus, it will be up to a jury to resolve this dispute.

The Court denies summary judgment as to Defendants' affirmative defenses asserting contributory (or, more properly, comparative) negligence on the part of the Pearsons.

## C. Affirmative Defenses Based Upon Tort Immunity

Green's Fourth Affirmative Defense generally asserts the Illinois Local Governmental and Governmental Employees Tort Immunity Act (hereinafter, the "TIA") as a defense. [187] at 25. The TIA, 745 ILL. COMP. STAT. 10/1, *et seq.*, embodies the Illinois legislature's "attempt to create certain uniform rules of immunity as exceptions to the general rule of municipal liability." *Aikens v. Morris*, 583 N.E.2d 487, 490 (Ill. 1991). As the TIA derogates the common law, courts strictly construe the Act against the governmental entity. *Sablik v. County of De Kalb*, 163 N.E.3d 181, 185 (Ill. App. Ct. 2019) (citing *Van Meter v. Darien Park District*, 799 N.E.2d 273, 286 (Ill. 2003). It therefore follows that the party invoking the TIA must rely upon a specific immunity provision. *See id.* (citing *Murray v. Chi. Youth Ctr.*, 864

18

N.E.2d 176, 185 (Ill. 2007)). Therefore, the Court grants Plaintiffs' motion for summary judgment as to this defense.

The Board Defendants and Defendant Green also all seek to invoke discretionary immunity, derived from § 2-201. *See* [187] at 25. Section 2-201 of the TIA provides:

> a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused.

745 ILL. COMP. STAT. ANN. 10/2-201. Discretionary immunity for public officials remains premised "upon the idea that such officials should be allowed to exercise their judgment in rendering decisions without fear that a good-faith mistake might subject them to liability." *Andrews v. Metro. Water Reclamation Dist. of Greater Chi.*, 160 N.E.3d 895, 905 (Ill. 2019) (quoting *Harrison v. Hardin Cnty. Cmty. Sch. Dist. No. 1*, 758 N.E.2d 848, 852 (Ill. 2001)). Section 2-201 grants broad immunity and, in fact, "offers the most significant protection afforded to public employees under the [TIA]." *Id.* (quoting *Arteman v. Clinton Cmty. Unit Sch. Dist. No. 15*, 763 N.E.2d 756, 762 (Ill. 2002)).

An employee can clothe himself with § 2-201 immunity "if he holds *either* a position involving the determination of policy *or* a position involving the exercise of discretion." *Ellis v. City of Chicago*, 272 F. Supp. 2d 729, 735 (N.D. Ill. 2003) (quoting *Harinek v. 161 N. Clark St. Ltd. P'ship*, 692 N.E.2d 1177, 1181 (Ill. 1981) (emphasis in original)). In addition, immunity will not attach unless the injury itself "results from an act performed or omitted by the employee in determining policy

19

*and* in exercising discretion." *Id.* (quoting *Harinek*, 692 N.E.2d at 1181) (emphasis in original); *Van Meter v. Darien Park Dist.*, 799 N.E.2d 273, 285 (Ill. 2003) (Our "cases have made clear that there is a distinction between situations involving the making of a policy choice and the exercise of discretion," and municipal defendants are "required to establish both of these elements" to "invoke immunity under section 2-201.").

Policy determinations "are those acts that require the balancing of competing interests to make a judgment as to what solution will best serve those interest[s]." *Ellis*, 272 F. Supp. 2d at 735; *Hill v. Cook County*, 463 F. Supp. 3d 820, 848 (N.D. Ill. 2020). Among other things, these interests include safety, convenience, and cost. *Hill*, 463 F. Supp. 3d at 848. Discretion involves personal deliberation and judgment on whether to perform an act or in what manner it should be performed and involves decisions that are "unique to a particular public office." *Id*; *Snyder v. Curran Township*, 657 N.E.2d 988, 993 (Ill. 1995).

Relatedly, ministerial acts are those performed "on a given state of facts, in a prescribed manner, in obedience to legal authority, and without reference to the official's discretion as to the propriety of the act." *Trotter v. Sch. Dist. 218*, 733 N.E.2d 363, 373 (Ill. App. Ct. 2000). An official may exercise its discretion in selecting and adopting a plan, but "as soon as it begins to carry out that plan, it acts ministerially and is bound to see that the work is carried out in a reasonably safe and skillful manner." *Id.* at 374; *In re Chi. Flood Litig.*, 680 N.E.2d 265, 272–73 (Ill. 1997) ("Official duty is ministerial, when it is absolute, certain and imperative, involving

20

merely the execution of a set task . . . ." (quoting *City of Chicago v. Seben*, 46 N.E. 244, 246 (Ill. 1897))). Section 2-201 provides no immunity for ministerial acts. *Trotter*, 733 N.E.2d at 376.

Plaintiffs seek judgment on Defendant Green's § 2-201 defense, arguing that Green is not a public employee serving in a position involving the determination of policy or exercising the discretion of any policy. [197] at 5–6. In their brief, District Defendants make no attempt to argue that Green held such a position, or that she otherwise engaged in policy determinations. *See* [226] at 12. As such, Green has not met her burden and will not be able to invoke discretionary immunity. *See Harrison v. Deere & Co.*, 533 Fed. App'x 644, 647 (7th Cir. 2013) (noting that a defendant bears the burden to establish an affirmative defense); *Thomas v. Dart*, Case No. 22-cv-2026, 2025 WL 524170, at *4 (N.D. Ill. Feb. 18, 2025) (A court "has no duty to do legal research for a litigant" or to "construct the legal arguments open to parties, especially when they are represented by counsel."); *Beard v. Whitley Cnty. REMC*, 840 F.2d 405, 408–09 (7th Cir. 1988); *see, e.g., Valentino v. Vill. of S. Chi. Heights.* 575 F.3d 664, 679–80 (7th Cir. 2009) (holding that the mayor's "one-time decision to fire one employee" does not involve "competing interests and judgment calls that would meet the Illinois courts' definition of a 'policy decision'").

The District and Primdahl also raise the defense of § 2-201 in their motion for summary judgment.

Plaintiffs bring identical negligence claims against the District and Primdahl, [182] ¶ 46(a)–(h); *id.* ¶ 46(i)–(p), claiming Defendants: (1) failed to train bus

personnel, (2) failed to supervise bus personnel, (3) failed to implement certain policies, and (4) failed to maintain the bus. Although § 2-201 expressly immunizes "public employees," Illinois courts hold that local public entities "are also clothed with immunity if their employees are not liable for the injury resulting from their acts or omissions." *LaPorta v. City of Chicago*, 277 F. Supp. 3d 969, 997 (N.D. Ill. 2017) (citing *Arteman*, 763 N.E.2d at 762–63); *see also Weiler v. Vill. of Oak Lawn*, 86 F. Supp. 3d 874, 885 (N.D. Ill. 2015). Therefore, if Primdahl is immune, then the District is also immune.

First, Primdahl holds a position involving the determination of policy or the exercise of discretion. *See Harinek*, 692 N.E.2d at 1181. Her position involves the "oversight of transportation operations and staff" and requires "the balancing of competing interests and the exercise of discretion," [201] at 8, such as determining which transportation plans to carry out during the school year. Plaintiffs do not dispute this factual aspect of the defense. *See* [229] at 8–10 (focusing on the nature of the acts rather than Primdahl's position).

For the next element, Board Defendants argue that Illinois courts have found the supervision of employees to involve both the determination of policy and the exercise of discretion under § 2-201. [201] at 7 (citing *Reed v. City of Chicago*, No. 01-cv-7865, 2002 WL 406983, at *3 (N.D. Ill. 2002)). Plaintiffs counter this assertion by quoting the Illinois Administrative Code: "Personnel responsible for special transportation shall be given training experiences which will enable them to understand and appropriately relate to children with disabilities." 23 ILL. ADMIN.

22

CODE 226.750(b)(5); [229] at 9.  They argue that Green and Karnick were given zero training on how to secure a wheelchair on a school bus, and thus, a complete failure to complete a legal duty cannot count as a policy or discretionary act (since there exists a duty to comply with the laws and regulations).  [229] at 9.

Even though a requirement mandated by law can transform a discretionary act into a ministerial one, *Chavez v. Vill. of Kirkland*, No. 2-23-0009, 2024 WL 621584, at \*5 (Ill. App. Ct. Feb. 14, 2024); *see Harinek*, 692 N.E.2d at 1182, the provision Plaintiffs cite does not go this far.  Here, the code section does not prescribe a specific duty to teach bus attendants how to secure wheelchairs, but rather, it generally directs those tasked with special transportation to receive training that helps them "understand and appropriately relate to children with disabilities."  This statutory language leaves Primdahl discretion to determine how to achieve this goal. *See Harinek*, 692 N.E.2d at 1182; *see* [184] at 6.[7]  Therefore, based on the record, her actions cannot be said to be ministerial as a matter of law.

Primdahl's decisions concerning training and supervision remain based upon policy considerations such as safety, convenience, and cost.  Also, Primdahl had no obligation to institute the specific policies Plaintiffs requested.  *See, e.g.*, [182] ¶¶ 46(m).  Choosing to institute or forego policies such as policies requiring bus personnel to carry parent contact information remained within Primdahl's discretion, as she weighed the costs and benefits of many such options and determined which to

---

[7] In this regard, the record shows Primdahl provided some "training" to Green and Karnick in meeting the needs of special education students: per the State's curriculum, the pre-ride checklist for the transportation of special needs students, and the article furnished to Green and Karnick in their yearly folder entitled "Wheelchair Transport Safety."  [249] ¶¶ 15, 16.

23

implement on the District's school buses. As a result, § 2-201 immunizes Primdahl against liability for failing to properly train or supervise Green and Karnick.

In short, Primdahl remains entitled to immunity for her allegedly negligent actions; so too the District.[89]

## D. Section 24-24 of the Illinois School Code

Finally, District Defendants seek summary judgment on Plaintiff's negligence claim because of § 24-24 of the Illinois School Code. The School Code did not derive from the TIA, so courts interpret the two as independent statutes. *Henrich v. Libertyville High Sch.*, 712 N.E.2d 298, 303 (Ill. 1998). Section 24-24 states that "teachers, other licensed educational employees, and any other person, whether or not a licensed employee, providing a related service for or with respect to a student shall . . . [i]n all matters relating to the discipline in and conduct of the schools and the school children . . . stand in the relation of parents and guardians to the pupils. This relationship shall extend to all activities connected with the school program, including all athletic and extracurricular programs, and may be exercised at any time

---

[8] Plaintiffs seek summary judgment on Defendants § 3-108 affirmative defenses. Section 3-108 of the TIA provides: "Except as otherwise provided in this Act, neither a local public entity nor a public employee who undertakes to supervise an activity on or the use of any public property is liable for an injury unless the local public entity or public employee is guilty of willful and wanton conduct in its supervision proximately causing such injury." 745 ILL. COMP. STAT. ANN. 10/3-108(a). The act of supervising employees falls within the coverage of § 3-108's supervisory immunity. *See Flores v. Palmer Marketing, Inc.,* 836 N.E.2d 792, 795 (Ill. App. Ct. 2005). And Plaintiffs' allegation that the Board Defendants failed to train bus personnel with the skills necessary to ensure the safe operation of the school bus falls squarely within this provision, and the Board Defendants would be entitled to immunity under this section as well.

[9] Plaintiffs also seek summary judgment as to Board Defendants' Affirmative Defenses under § 2-204. Section 2-204 does not apply because Plaintiffs seek to hold Primdahl personally liable for her own actions. *See Jane Doe-3 v. McLean Cnty. Unit Dist. No. 5 Bd. of Dirs.*, 973 N.E.2d 880, 893 (Ill. 2012) ("Plaintiffs do not claim that defendants are vicariously liable for the conduct of White, and thus section 2–204 is of no help to defendants.").

for the safety and supervision of the pupils in the absence of their parents or guardians." 105 ILL. COMP. STAT. 5/24-24.

This provision applies to both disciplinary and non-disciplinary matters. *Kobylanski v. Chicago Bd. of Educ.*, 347 N.E.2d 705, 708 (Ill. 1976). It confers immunity for ordinary negligence, but, unlike the TIA, it does not immunize willful or wanton conduct. *Doe v. Bd. of Educ. of Cmty. Unit Sch. Dist. 300*, No. 2-25-0038, 2025 WL 3496756, at *6 (Ill. App. Ct. Dec. 5, 2025). The provision places teachers and other educational personnel *in loco parentis* with students, so, by analogy, it does not permit liability for injuries to a child, absent willful and wanton misconduct. [201] at 6; *see Cates v. Cates*, 619 N.E.2d 715, 726 (Ill. 1993).

As the District and Primdahl have already received immunity through the TIA, this Court need only consider Green and Karnick. While initially the Section covered just "teachers and other certified educational employees," in 1995, the legislature expanded coverage to "teachers, other certified educational employees, and any other person, whether or not a certified employee, providing a related service for or with respect to a student." Bus drivers and bus aides plainly fall into the category of "any other person… providing a related service for or with respect to a student."[10]

---

[10] Plaintiffs argue that Illinois has created different policy rationales that uniquely constrain bus drivers. [229] at 5–6; *see also Doe v. Sanchez*, 52 N.E.3d 618, 627 (Ill. App. Ct. 2016) ("Illinois has a public policy favoring the safe transportation of students that is supported by the courts, the legislature, and our constitution."). While Illinois places a heightened duty on school bus drivers, School Code § 24-24 still operates to immunize negligent breaches of that duty. *See id.* at 626–27 (holding in the context of the TIA that "the existence of a duty and the existence of an immunity are separate issues" and "if the legislature provides an immunity, as it has for various public employees through the [TIA], the initial duty analysis is not affected.").

Additionally, the conduct subject to § 24-24 immunity must arise out of the student-teacher relationship. *See Cates*, 619 N.E.2d at 726. Caselaw makes clear this includes the "physical movement of a student." *See* [229] at 6 (quoting *Jackson v. Chi. Bd. of Educ.*, 549 N.E.2d 829, 831–32 (Ill. App. Ct. 1989)); *see Arteman*, 763 N.E.2d at 761 ("We further noted, however, that the immunity recognized in *Kobylanski* concerned" the "exercise of the teacher's control over the student's conduct *or physical movement.*") (emphasis added).

Ultimately, Plaintiffs complain about the manner Defendants transported Corban. So, Plaintiffs' negligence claim against Green and Karnick falls within § 24-24's scope, and, therefore, they will receive immunity.

## IV. District Defendants' Motion for Summary Judgment

The District Defendants have jointly moved for summary judgment as to all of Plaintiffs' claims. [199]. Having determined that these Defendants remain immune from Plaintiffs' negligence claim, the Court need not address that claim again here. The Court considers the motion as to the remaining claims below.

## A. Willful and Wanton (Count II)

Plaintiffs allege that Defendants' conduct subjects them to liability because it was willful and wanton. *See* [182] at 11–14. Illinois law recognizes no separate and independent tort of willful and wanton conduct. *Krywin v. CTA*, 938 N.E.2d 440, 452 (Ill. 2010). Rather, willful and wanton conduct represents an aggravated form of negligence. *Id.* To state a claim, in addition to the basic elements of a negligence claim, Plaintiffs must also allege that Defendants exhibited "either a deliberate

26

intention to harm or an utter indifference to or conscious disregard for the welfare" of Corban. *Doe ex rel. Ortega-Piron v. Chi. Bd. Of Educ.*, 820 N.E.2d 418, 423 (Ill. 2004); 745 ILL. COMP. STAT. 10/1-210. A plaintiff must plead willful and wanton conduct, not through conclusions or labels, but through well-pled facts. *See also Winfrey v. Chi. Park Dist.*, 654 N.E.2d 508, 512 (Ill. App. Ct. 1995); *Adkins v. Sarah Bush Lincoln Health Ctr.*, 544 N.E.2d 733, 744 (Ill. 1989).

Courts have not determined a hard and fast rule for what constitutes willful and wanton conduct; rather, the claim turns on a thorough examination of the facts alleged. *See Winfrey*, 654 N.E.2d at 513. Willful and wanton conduct goes beyond "mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible future emergency," *Bialek v. Moraine Valley Cmty. Coll. Sch. Dist. 524*, 642 N.E.2d 825, 865 (Ill. App. Ct. 1994), and requires a "conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man." *Burke v. 12 Rothschild's Liquor Mart*, 593 N.E.2d 522, 531 (Ill. 1992) (quoting Restatement (Second) of Torts § 500, Comment g, at 590 (1965)).

Plaintiffs allege that the District and Terry Primdahl engaged in wanton and willful conduct when they "failed to provide bus operators with parent contact information to be used in the event of an emergency." [182] ¶ 51(m).[11] The District

---

[11] Plaintiffs also allege that "District 303, its agents, and employees otherwise willfully and wantonly operated the school bus in a reckless manner and with an intentional disregard or utter indifference to Corban's safety." [182] ¶ 182(n). Without sufficient supporting facts, this conclusory label cannot support Plaintiffs' claim. *See Winfrey v. Chi. Park Dist.*, 654 N.E.2d 508, 512 (Ill. App. Ct. 1995).

and Primdahl's discretionary immunity, through § 2-201, provides a defense for both negligent and willful and wanton misconduct. *Andrews*, 160 N.E.3d at 905. As addressed above, providing bus operators with parent contact information constitutes a policy decision and represents a decision uniquely tailored to Primdahl's office in her use of discretion. Therefore, Primdahl (and in turn the District) remain entitled to summary judgment on this claim.

Plaintiffs also allege that Green and Karnick engaged in wanton and willful conduct when they, jointly or individually: failed to perform a pre-trip inspection, [182] ¶ 51(a); failed to lock Corban's wheelchair into the latch system, *id.* ¶ 51(b); failed to fasten Corban's restraints, *id.* ¶ 51(c); heavily applied the brakes, *id.* ¶ 51(d); pulled and pushed Corban's arms when attempting to remove his body from under his wheelchair, *id.* ¶ 51(e); left Corban, helpless, under his chair while they dropped off another child, *id.* ¶ 51(f); failed to immediately call for medical assistance, *id.* ¶ 51(g); failed to contact emergency services in a timely manner, *id.* ¶ 51(h); withheld critical information from first responders, *id.* ¶ 51(i); failed to take reasonable precautions to ensure Corban's safety, *id.* ¶ 51(j); and ignored training, protocol, and instruction about how to transport children with disabilities, *id.* ¶ 51(k). Section 24-24 of the school code does not immunize willful and wanton conduct, so Green and Karnick may be found liable.

District Defendants believe that, notwithstanding any genuine factual disputes, as a matter of law, the acts complained of cannot be described as wanton and willful. They cite to *Barr v. Cunningham*, 89 N.E.3d 315 (Ill. 2017), and *Lynch*

28

*v. Board of Education of Collinsville Community Unit Dist. No. 10*, 412 N.E.2d 447 (Ill. 1980), to support their assertion that, as a matter of principle, school employees who exercise precautions cannot be guilty of willful and wanton conduct. [201] at 11.

But these cases do not create a categorical bar to willful and wanton conduct. In *Cunningham,* the "decision not to require the students to use available safety equipment, *standing alone*, [did] not rise to the level of willful and wanton conduct," 89 N.E.3d at 319 (emphasis added). Here, Plaintiffs complain of a series of actions that they assert add up to wanton and willful conduct, including what happened before, during, and after Corban's tipping event. Neither court relied upon an absolute exception, but rather both asked the question typical in a willful and wanton action: whether the defendants "fail[ed] to take reasonable precautions after 'knowledge of impending danger.'" *Id.* (quoting *Lynch*, 412 N.E.2d at 457).

The current record reveals numerous questions of fact for a jury, such as: how hard Green braked either time, whether Karnick believed a tipping event was likely given her suggestion to Green to be careful going around corners, whether the two waited too long to call for medical assistance and, for all these questions, whether the resulting answers showed "an utter indifference to or conscious disregard for the welfare" of Corban. Here, jurors may disagree on the nature of Green and Karnick's precautions under the circumstances. For this reason, the Court denies the District Defendants' motion for summary judgment as to Green and Karnick.

**B.    ADA, IDEA, and Rehabilitation Act (Counts IV and V)**

Plaintiffs bring claims under the ADA, IDEA, and Rehabilitation Acts.  District Defendants seek summary judgment as to all of them.

**1.    Plaintiffs' IDEA Claim**

The Individuals with Disabilities Education Act ("IDEA") offers federal funds to States in return for a commitment they will furnish a "free and appropriate public education" ("FAPE") to all children, regardless of disability.  *A.J.T. by and through A.T. v. Osseo Area Schs.*, 605 U.S. 335, 339–40 (2025).  The IDEA's primary means of achieving this goal of a FAPE is through the "individualized education program" ("IEP").  *Id.*  Addressing the "denial of a FAPE" is "the only relief the IDEA makes available."  *Fry v. Napoleon Cmty. Schs.*, 580 U.S. 154, 169 (2017) (quotation marks omitted).  In furthering this goal, parents and school officials are encouraged to cooperate to resolve disputes.  *See Patricia P. v. Bd. of Educ. of Oak Park*, 203 F.3d 462, 467–68 (7th Cir. 2000).  As a part of this cooperation, the IDEA entitles parents to an impartial due process hearing to resolve complaints.

The IDEA provides for judicial review in federal court to any "'aggrieved party by the findings and decision' made after the due process hearing."  *See Sch. Comm. of Town of Burlington, v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985) (analogous predecessor Act).  The Act empowers the reviewing court with the following authority: "[T]he court shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is

30

appropriate." *Id.*; 20 U.S.C. § 1415(i)(2)(C)). The question of a denial of a FAPE presents a mixed question of law and fact that courts review de novo. *Hjortness ex rel. Hjortness v. Neenah Joint Sch. Dist.*, 507 F.3d 1060, 1064 (7th Cir. 2007). Because courts, however, "do not have expertise in the area of educational policy, they must give 'due weight' to the results of the administrative decisions and should not substitute 'their own notions of sound educational policy for those of the school authorities which they review.'" *Patricia P.*, 203 F.3d at 466 (quoting *Bd. of Educ. of Murphysboro v. Ill. Bd. of Educ.*, 41 F.3d 1162, 1166 (7th Cir. 1994)). Finally, before filing a civil action, a complainant seeking relief under the IDEA must exhaust the scheme's administrative system to the same extent as if he had only sought relief through that process. 34 C.F.R. § 300.516(e); *Fry*, 580 U.S. at 158.

District Defendants argue that they are entitled to judgment as a matter of law on this claim for three reasons: (1) the statute precludes individual liability; (2) Plaintiffs failed to show damages; and (3) Defendants remain entitled to qualified immunity.

As to individual liability, the Court has already ruled on this issue, *see* [110]: *Stanek* expressly leaves open the possibility that individuals may be liable under the IDEA. *See also C.B. v. Bd. of Educ. of City of Chi.*, 624 F. Supp. 3d 898, 909 (declining dismissal of claims of individual liability under the IDEA because *Stanek*, no matter how sparsely reasoned, remains binding precedent in the Seventh Circuit).

As for damages, the parties agree that the IDEA does not allow for compensatory or punitive damages. *See C.B.*, 624 F.Supp.3d at 912. Plaintiffs

31

correctly note that they may seek a judgment awarding retrospective or prospective relief, possibly including a grant for money they will pay to fund a compensatory education. *See id.*; [229] at 17. Plaintiffs, though, still have not disclosed exactly what retrospective or prospective relief they seek. Certainly, equitable relief might become available, *Doe v. Loyola Univ. Chi.*, 100 F.4th 910, 912 (7th Cir. 2024) (explaining that the applicable relief must actually exist for the claim to be justiciable), so summary judgment remains premature because Plaintiffs are entitled to any relief the judgment ultimately allows, *Bd. of Educ. of Township High Sch. Dist. No. 211 v. Ross*, 486 F.3d 267, 278 (7th Cir. 2007); *see also* Fed. R. Civ. P. 54(c).

Finally, qualified immunity shields governmental actors performing discretionary functions from liability for monetary awards "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Chaklos v. Stevens*, 560 F.3d 705, 710 (7th Cir. 2009) (quoting *Sallenger v. Oakes*, 473 F.3d 731, 739 (7th Cir. 2007)); *see Lenea v. Lane*, 882 F.2d 1171, 1178–79 (7th Cir. 1989); *see generally Harlow v. Fitzgerald*, 457 U.S. 800 (1982). Generally, though, courts grant qualified immunity to public employees without analyzing whether their functions lean discretionary or ministerial. 33 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 8355 (2d ed. 2025) (In practice, "the discretionary-ministerial distinction seldom affects application of immunity doctrines given that the concept of 'discretion' is so capacious. Some lower courts have questioned whether the 'ministerial-discretionary function distinction' remains valid.").

Qualified immunity has two prongs, "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged violation," that a court may address in either order. *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (quoting *Williams v. City of Chicago*, 733 F.3d 749, 758 (7th Cir. 2013)). As an affirmative defense, a defendant must first properly raise qualified immunity. *Wilson v. Estate of Burge*, 667 F. Supp. 3d 785, 831 (N.D. Ill. 2023). To do this, a defendant must claim that his "conduct was justified by an objectively reasonable belief that it was lawful." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). After a defendant properly raises the defense, the plaintiff bears the burden to defeat it by either showing a constitutional right that was clearly established at the time of the challenged conduct or showing conduct "so egregious that no reasonable person could have believed that it would not violate clearly established rights." *Purvis v. Oest*, 614 F.3d 713, 717–18 (7th Cir. 2010) (quoting *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008)).

Here, District Defendants argue that they are entitled to qualified immunity because *Stanek* does not "clearly establish" individual liability under the IDEA. *Stanek* actually holds that individual liability remains possible under the IDEA. So, this argument does not go far; District Defendants have not properly raised the defense, so the Court denies their motion for summary judgment.

Even though the case has progressed to the summary judgment stage, Plaintiffs have still not provided the Court with the due process hearing record that

will ultimately be reviewed, nor have they disclosed what relief, available under the IDEA, they actually seek. For this reason, Plaintiffs shall come prepared to explain and support their IDEA claim at the Final Pretrial Conference.

**2. Plaintiffs' ADA and Rehabilitation Act Claims**

In Counts IV and V, Plaintiffs claim violations of the Americans with Disabilities Act ("ADA") and the Rehabilitation Act. The standards for these two acts mirror each other. *See Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). To prevail on an ADA claim, a plaintiff must show "that he is a 'qualified individual with a disability' who 'by reason of such disability' was 'denied the benefits of the services, programs, or activities of a public entity.'" *Brown v. Meisner*, 81 F.4th 706, 708–09 (7th Cir. 2023) (quoting 42 U.S.C. § 12132). Instead of a "public entity," § 504 of the Rehabilitation Act imposes liability based upon a program's receipt of federal financial assistance. *Reed*, 915 F.3d at 484 (quoting *Mallett v. Wis. Div. of Vocational Rehab.*, 130 F.3d 1245, 1257 (7th Cir. 1997)).

The parties agree that Corban qualifies as an individual with disabilities within the American with Disabilities Act and § 504 of the Rehabilitation Act, [227] ¶ 1; they also agree that the District qualifies as a local public entity within the meaning of Title II of the ADA and receives federal financing within the meaning of the Rehabilitation Act, *id.* ¶ 5. The parties dispute whether the District denied Corban benefits due to his disability.

A Title II ADA claim may be based upon one of three theories: "(1) the defendant intentionally acted on the basis of the disability, (2) the defendant refused

34

to provide a reasonable modification, or (3) the defendant's rule disproportionally impacts disabled people." *Wis. Cmty. Servs. v. City of Milwaukee*, 465 F.3d 737, 753 (7th Cir. 2006) (quotation omitted). Here, Plaintiffs advance the first theory.

To prove that a defendant intentionally acted upon the basis of a disability, a plaintiff must show either intentional discrimination or "deliberate indifference." *McDaniel v. Syed*, 115 F.4th 805, 823 (7th Cir. 2024) (citing *Lacy v. Cook County*, 897 F.3d 847, 862–63 (7th Cir. 2018); *see also Hildreth v. Butler*, 960 F.3d 420, 431 (7th Cir. 2020). The deliberate indifference standard stems from "the clear purpose and evolution of the ADA. Title II was modeled after section 504, which was meant to combat discrimination that is 'most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect.'" *Lacy,* 897 F.3d at 863 (quoting *Alexander v. Choate*, 469 U.S. 287, 295 (1985)). Deliberate indifference requires a showing of "both (1) knowledge that a harm to a federally protected right is substantially likely, and (2) a failure to act upon that likelihood." *Id.* (quotation omitted).

Plaintiffs allege that the District constructively denied Corban the benefits of "services, programs or activities" because the accident left him so anxious that he could no longer ride the bus. [229] at 19. But deliberate indifference requires a "deliberate choice," *Lacy*, 897 F.3d at 862, and Plaintiff's theory belies any such choice.

What remains, outside of conclusory statements pointing to the District Defendants' liability, *see* [229] at 19, 21, is Plaintiffs' claim that Defendants' failure

35

to train constitutes intentional action done on the basis of the disability. District Defendants argue that ADA and Rehabilitation Act claims based upon a "failure to train" are not cognizable; they also argue that Plaintiffs have failed to proffer evidence demonstrating a "failure to train." [201] at 22–24.

The Court rejects Defendants' cognizability argument. District Defendants argue that Plaintiffs' claim improperly stems from facts predating the alleged federal violation. *See Paine v. City of Chicago*, No. 06-cv-3173, 2009 WL 10687409, at *3 (N.D. Ill. May 21, 2009). Nevertheless, a federal claim founded in a failure to train theory may proceed, so long as the party directs the evidence toward showing deliberate indifference. *See Westmoreland v. Dart*, No. 21-cv-4330, 2023 WL 7103368, at *6 (N.D. Ill. Oct. 27, 2023) (ADA) (quoting *Lacy*, 897 F.3d at 853) (holding that "a failure to make reasonable modifications in policies, practices, or procedures can constitute discrimination under Title II"); *see also S.J. v. Perspectives Charter School*, 685 F. Supp. 2d 847, 858 (N.D. Ill. 2010) (Non-ADA) (quoting *Cornfield by Lewis v. Consol. High Sch. Dist. No. 230*, 991 F.2d 1316, 1327 (7th Cir. 1993)). And that is the case here, at least for the purposes of the motion for summary judgment.

Among other things, the Plaintiffs have presented evidence in the record showing that, in her nine years of driving a school bus, Green received no demonstrative training as to how to secure a wheelchair. To the extent the ride-along evaluations were intended to show proficiency with wheelchair transport, the fact that instructions about special transportation were stricken suggests that the training expressly omitted such coverage. Instead, the District gave Green, and other

36

bus personnel, a one-page pre-ride checklist for transporting students with special needs and sent her an article each year. A jury could reasonably find, based upon such evidence, that Corban's injuries resulted from the District's failure to train its bus personnel in how to safely transport children in wheelchairs.

In arguing that Plaintiffs cannot, as a matter of law, show deliberate indifference, Defendants cite *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). In *Foley*, blizzard-like conditions knocked out the elevators servicing the City of Lafayette's train station and made ramps to the train platforms impassable. *Id.* at 926–28. The city quickly responded and had the elevators back up and running within a few days. *Id.* The court rejected the plaintiff's ADA claim because the incident failed to suggest a policy of neglect; rather, "in the normal course of operation" the train station remained "fully accessible to individuals with disabilities." *Id.* at 928–29. The court also held that the failure to immediately clear the platform ramps constituted an isolated act of negligence by a city employee, not an ADA violation. *Id.* at 930–31.

*Foley* remains inapposite: Plaintiffs allege that the District's training (or lack thereof) perpetuated a policy that neglected the safe transportation of disabled students. Plaintiffs have offered enough evidence to get to a jury on the question of whether the District, in implementing a training program that omitted demonstrative training and consisted predominantly of issuing a short checklist and

an article, constituted deliberate indifference to the safety of students using wheelchairs who rode their school buses.[12]

### 3. Plaintiffs' Family Expense Act Claim (Count III)

The Family Expense Act allows parents and guardians of minor children to sue to recover medical expenses incurred as a result of third parties' conduct. 750 ILL. COMP. STAT. 65/15. The cause of action assumes the existence of an underlying claim. Because Plaintiffs' tort claim survives, this claim survives. *See Robinson v. Rockledge Furniture, LLC*, No. 20-cv-4204, 2024 WL 2801581, at *8 (N.D. Ill. May 31, 2024).

## V. Numotion's Motion for Summary Judgment

Plaintiffs' TAC asserts two causes of action against Defendant Numotion: negligence (Count VI) and negligent design (Count VII). [182] at 18–21. Numotion moves for summary judgment on both. [189]. For reasons explained below, the Court denies Numotion's motion as to Count VI but grants the motion as to Count VII.

Preliminarily, Numotion seeks judgment as to both counts based upon Green's criminal conviction; Numotion argues that Green's criminal acts caused Corban's injuries and that it owed no duty to protect against Green's criminal acts.

In Illinois, an independent criminal act of a third person acts as a superseding cause of injury relieving a defendant of liability so long as the criminal act was not

---

[12] Plaintiffs also seek to hold the District vicariously liable for other defendants' conduct. But Title II of the ADA likely disallows such liability. *See Doe v. Bd. of Educ. of City of Chi.*, 611 F. Supp. 3d 516, 531 (N.D. Ill. 2020) (explaining that Section 504 is virtually identical to, and often analogized to, Title IX, which does not permit vicarious liability); *Ravenna v. Vill. of Skokie*, 388 F. Supp. 3d 999, 1004–08 (N.D. Ill. 2019) (noting that Title II lacks language creating individual or personal liability and explaining that the "Seventh Circuit has held when a statute fails to provide individual or personal liability, vicarious liability based on agency principles is *not* available") (quotation omitted)).

reasonably foreseeable at the time of the defendant's act. *Petrauskas v. Wexenthaller Realty Mgmt., Inc.*, 542 N.E.2d 902, 909 (Ill. App. Ct. 1989). Generally, the question of proximate cause presents a question of fact, but a defendant may escape liability by demonstrating the intervening event was foreseeable as a matter of law. *Id.*

Here, the parties do not discuss the foreseeability of Green's criminal act. Nor does the record resolve the issue. Green was convicted of Endangering the Life or Health of a Child, but the factual predicate underlying Green's criminal conviction is not part of the parties' filings. Neither party submitted the relevant records from the state court proceeding, and it remains unclear whether the conviction stemmed from the way in which Green drove, braked, secured (or failed to secure) existing straps or belts, responded to the initial tip, or something else entirely. Therefore, Numotion has not met its burden of showing that it is entitled to judgment as a matter of law on this basis.

Numotion also argues that it is entitled to summary judgment on Plaintiffs' negligence claim because Plaintiffs fail to proffer evidence to satisfy the elements of that claim.

To state a "cause of action for negligence under Illinois law, a plaintiff 'must allege facts that establish the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by that breach.'" *Johnson v. Edward Orton, Jr. Ceramic Found.,* 71 F.4th 601, 609 (7th Cir. 2023) (quoting *Marshall v. Burger King Corp.,* 856 N.E.2d 1048, 1053 (Ill. 2006)). As for the existence of a duty, the Supreme Court of Illinois "has long recognized that 'every

39

person owes a duty of ordinary care to all others to guard against injuries which naturally flow as a reasonably probable and foreseeable consequence of an act, and such a duty does not depend upon contract, privity of interest or the proximity of relationship, but extends to remote and unknown persons.'" *Id.* (quoting *Simpkins v. CSX Transp., Inc.*, 965 N.E.2d 1092, 1097 (Ill. 2012)). The parties dispute, however, whether Numotion breached any duty and whether any such breach proximately caused Corban's injury.

The record shows that Corban had a wheelchair evaluation with David Cingano on April 7, 2016. [249] ¶ 27. Although Lisa Pearson claims Cingano failed to raise the issue of anti-tippers, Cingano testified that his normal practice was to discuss those features and there was "definitely a high possibility" that he did discuss them with Pearson. [227] ¶ 11. Lisa Pearson also conceded that she received the Owner's Manual with the purchase of the wheelchair and read it; the manual unquestionably covers anti-tippers. *See id.*; [188] ¶¶ 45, 77; *see also* [188] ¶¶ 35, 67. In fact, the Manual "provides great detail concerning the intended function of support wheels and when support wheels are required versus optional." [245] at 5.

At the time of this evaluation, Corban was still doing partial transfers out of his wheelchair via "stand and pivot." [188] ¶ 75. Cingano testified that he believed that support wheels would have interfered with Corban's independence and transfer. *Id.* ¶¶ 75, 78. Lisa maintains she relied on Cingano's superior knowledge during the meeting, *see* [227] ¶ 32, while Cingano maintains the feature decisions were a team effort. *Id.* ¶ 33.

40

The Manual explained that anti-tippers would be optional for users who weigh less than 200 pounds and whose speed package is reduced to 5 miles per hour. [188] ¶ 77. On the day of the accident, Corban weighed 176 pounds, and his chair included a mechanical limitation for speeds of less than 5 miles per hour. *Id.* ¶¶ 3, 17. The Manual also contained transportation warnings, including one that users should not be transported while in their wheelchair unless it is "crash-tested approved" by Permobil. [188-20]; *see* 190 at 8.

Ultimately, anti-tippers were not installed on Corban's chair. On October 5, 2017, Lisa Pearson signed a form refusing anti-tippers and a seat/pelvic belt, releasing Numotion from liability based upon her decision to include or omit features including these. [202-9]. The next day, on October 6, 2017, Numotion and a physical therapist performed a collaborative evaluation on Corban's wheelchair, and the form completed in the course of that evaluation failed to note anything in the anti-tippers section. [249] ¶ 29.

Gerald Goebel opines that, according to the standards in the wheelchair industry, among other things, all available options should be discussed with a client or caregiver. *See id.* ¶¶ 23, 27, 28. As a result, Plaintiffs dispute the materiality of Lisa Pearson's release prior to her consultation as industry and state standards require consultation before making modifications to a wheelchair. *See id.* ¶ 29. Similarly, Timothy Hicks opines that it is not clear that Numotion "provided enough information about the need or purpose for the anti-tip support wheels at the time of purchase by the Pearsons." [190] at 13. In short, the evidence demonstrates the

41

existence of a factual dispute as to whether Numotion failed to discuss anti-tippers and whether, if it did, that failure constitutes a breach of the duty it owed to Plaintiffs.

Material issues of fact also exist as to causation. Plaintiffs' own expert Hicks testified at his deposition that anti-tippers were unlikely to make a difference in the accident. [190] at 8–10. Numotion's expert Manary agreed that anti-tippers were "not required because support wheels are not critical to performance" and offer no added benefit to a properly restrained wheelchair. *Id.* at 10. But the District Defendant's expert, Toomey, opined that the anti-tippers "would have likely prevented the subject wheelchair from tipping forward." [228] at 6. As a result, Plaintiffs may proceed on their negligence claim against Numotion.

Although Plaintiffs may proceed on their negligence claim against Numotion, the Court finds that Numotion is entitled to judgment as a matter of law on Plaintiffs' negligent design claim, Count VII.

To win on a negligent product design claim, a plaintiff must establish the requirements of an ordinary negligence claim—the existence of a duty, a breach of that duty, an injury proximately caused by that breach, and damages, *Jablonski v. Ford Motor Co.*, 955 N.E.2d 1138, 1153–54 (Ill. 2011)—and must also prove that the product was defective and "unreasonably dangerous" when it left the manufacturer's control. *Navarro v. Fuji Heavy Indus., Ltd.,* 925 F. Supp. 1323, 1326–27 (N.D. Ill. 1996), *aff'd*, 117 F.3d 1027 (7th Cir. 1997); *Baugh v. Cuprim S.A. de C.V.*, 845 F.3d 838, 849 (7th Cir. 2017) (similarly asserting that "negligence focuses on the allegedly

42

unreasonably dangerous condition of a product"). Such a claim ordinarily remains proper only when asserted against the product manufacturer, which has a "nondelegable duty to design a reasonably safe product." *Johnson*, 71 F.4th at 610 (quoting *Jablonski*, 955 N.E.2d at 1154) ; *see also Navarro*, 925 F. Supp. at 1326 (observing that, in a negligent design action, a plaintiff "must demonstrate that the product was defective when it left manufacturer's control"), *aff'd*, 117 F.3d 1027 (7th Cir. 1997). Plaintiffs do not argue Numotion manufactured Corban's wheelchair, so summary judgment is appropriate.

Even if Plaintiffs could sue Numotion as a manufacturer, the negligent design claim also fails on its merits. In a negligent-design case, "the key question is 'whether the manufacturer exercised reasonable care in designing the product,' which comes down to 'whether in the exercise of ordinary care the manufacturer should have foreseen that the design would be hazardous to someone.'" *Johnson*, 71 F.4th at 610 (quoting *Jablonski*, 955 N.E.2d at 1154). To show that "the harm was foreseeable, the plaintiff must show that 'the manufacturer knew or should have known of the risk posed by the product design at the time of manufacture' of the product." *Id.* (quoting *Jablonski*, 955 N.E.2d at 1154). While a manufacturer must protect against foreseeable risks it need not design out and guard against every conceivable risk. *Jablonski*, 955 N.E.2d at 1157.

Numotion proffers evidence showing that the wheelchair's design complied with relevant industry standards for wheelchairs used during transport, namely RESNA ("Rehabilitation Society and Assistive Technology Society of North America")

43

Section 10 and ISO 7176-19 design standards (which do not require or even reference support wheels). *See* [188] ¶¶ 15, 56, 58. Although not dispositive, relevant industry standards are properly considered, *see Stevenson v. Windmoeller & Hoelscher Corp.*, No. 19-cv-52, 2021 WL 1978348, at *4 (N.D. Ill. May 18, 2021); *Jablonski*, 955 N.E.2d at 1156; *Anderson v. Raymond Corp.*, 61 F.4th 505, 511 (7th Cir. 2023) (quoting *Baugh*, 845 F.3d at 845).

In response, Plaintiffs offer no contrary evidence to suggest that the wheelchair was inherently dangerous.[13] *See* [245] at 5. They simply assert that the omission of anti-tippers "in and of itself creates a question of fact for the jury: whether the wheelchair was reasonably safe for Corban." [228] at 3–4. But at summary judgment, "a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quotation omitted). Plaintiffs have offered no evidence to show that the absence of anti-tippers made the chair inherently dangerous. The mere fact that an accident occurred does not get Plaintiffs to a jury. *See, e.g., Sorce v. Naperville Jeep Eagle, Inc.*, 722 N.E.2d 227, 238 (Ill. App. Ct. 1999) (A "legal inference of defectiveness may not be drawn merely from evidence that an injury occurred.") (quoting *Norman v. Ford Motor Co.*, 513 N.E.2d 1053, 1056 (Ill. App. Ct. 1987)); *Show v. Ford Motor Co.*, 659 F.3d 584, 587–88 (7th Cir. 2011) ("Counsel for the plaintiffs repeat the mantra that cars 'just don't roll over in low-speed collisions' unless defectively designed. How do they know that? . . . Without an expert's assistance the decision would depend on speculation,

---

[13] This is a different question than whether Numotion was negligent in failing to recommend anti-tippers.

which cannot establish causation—an issue on which plaintiffs bear both the burden of production and the risk of non-persuasion.").  Plaintiffs' own expert testified at his deposition that anti-tippers were unlikely to make a difference in the accident.  [190] at 8–10.  And Numotion's expert agreed that anti-tippers were "not required because support wheels are not critical to performance" and offer no added benefit to a properly restrained wheelchair.  *Id.* at 10.

On this record, Plaintiff's negligent design claim fails as a matter of law, and the Court grants summary judgment to Numotion on Count VII.

## VI.    Conclusion

For the reasons explained above, this Court denies Plaintiffs' motion to strike the affirmative defenses asserted by the Board Defendants [191] and Defendant Green [192], and grants in part, and denies in part, Plaintiffs' motion to strike the affirmative defenses asserted by Defendant Numotion [193].  The Court also grants in part, and denies in part, Plaintiffs' motions for summary judgment as to the Board Defendants [196] and Defendant Green [197] and denies Plaintiffs' motion for summary judgment as to Defendant Karnick [198].  The Court grants in part, and denies in part, the District Defendants' motion for summary judgment [199] and Numotion's motion for summary judgment [189]. Therefore, the following claims remain: a willful and wanton claim against Defendants Green and Karnick (Count II), a derivative Family Expense Act claim (Count III), an ADA and Rehabilitation Act claim against the School District (Counts IV and V), an IDEA claim against all District Defendants (Count IV), and a negligence claim against Numotion (Count VI).

Plaintiffs shall come to the Final Pretrial Conference prepared to orally support their IDEA claim.  Additionally, within seven days of entry of this order, the parties shall file a joint status report indicating whether they are interested in a settlement conference with the Court.

Dated: March 27, 2026          Entered:

John Robert Blakey
United States District Judge

46